## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MERCURIA ENERGY GROUP LIMITED, <br><br> Petitioner, <br><br> v. <br><br> REPUBLIC OF POLAND, <br><br> Respondent. | Civil Action No. 1:23-cv-03572 <br><br> **Hon. Trevor N. McFadden** <br><br> **ORAL ARGUMENT REQUESTED** |

## PETITIONER'S SURREPLY MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS THE PETITION <u>OR STAY THE PROCEEDINGS</u>

DLA PIPER LLP (US)
James E. Berger (D.C. Bar No. 481408)
Charlene C. Sun (D.C. Bar No. 1027854)
Erin Collins (D.C. Bar No. 1781667)
Tel: (212) 335-4715
Fax: (212) 884-8715
1251 Avenue of the Americas
New York, NY 10020
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com
erin.collins@us.dlapiper.com

John C. Canoni (*pro hac vice*)
Tel: (214) 743-4500
Fax: (214) 743-4545
1900 N. Pearl St, Suite 2200
Dallas, Texas
john.canoni@us.dlapiper.com

*Attorneys for Petitioner*

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ........................................................................................ 1

II.   THE D.C. CIRCUIT'S RULING IN *NEXTERA V. SPAIN* ................................................ 3

III.  ARGUMENT ............................................................................................................... 6

    A.    Poland Fails to Meet its Burden to Demonstrate that the Award Should Not Be
Recognized Under Article V of the New York Convention ................................... 6

        1.    This Court Should Defer to the Tribunal's Findings Concerning the Scope
of an Agreement to Arbitrate .................................................... 6

        2.    Poland's Article V(1)(A) Arguments Must Be Rejected ......................... 10

        3.    The Award Does Not Violate U.S. Public Policy (Article V(2)(b)) ......... 20

    B.    This Court Has Discretion To Confirm The Award Notwithstanding The
Applicability Of Any Ground For Non-Recognition ........................................... 22

    C.    Poland's *Forum Non Conveniens* Argument Must be Rejected .......................... 23

IV.   CONCLUSION ........................................................................................................... 23

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*9REN Holding S.A.R.L. v. Kingdom of Spain*,
2023 WL 2016933 (D.D.C. Feb. 15, 2023) .......................................................................... 3

*Armenian Assembly of Am., Inc. v. Cafesjian*,
758 F.3d 265 (D.C. Cir. 2014) ........................................................................................... 12

*Balkan Energy Ltd. v. Republic of Ghana*,
302 F. Supp. 3d 144 (D.D.C. 2018) ..................................................................................... 8

*BCB Holdings Ltd. v. Gov't of Belize*,
232 F. Supp. 3d 28 (D.D.C. 2017) ..................................................................................... 19

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
5 F. Supp. 3d 25 (D.D.C. 2013), *aff'd*, 794 F.3d 99 (D.C. Cir. 2015) ................................. 20

*BG Grp. PLC v. Republic of Arg.*,
572 U.S. 25 (2014) ......................................................................................................... 7, 11

*Blasket Renewable Investments, LLC v. Kingdom of Spain*,
665 F. Supp. 3d 1 (D.D.C. 2023) ......................................................................................... 3

*Chevron Corp. v. Ecuador*,
795 F.3d 200 (D.C. Cir. 2015) .......................................................................................... 1, 7

*Chevron Corp. v. Republic of Ecuador*,
949 F. Supp. 2d 57 (D.D.C. 2013), *judgment entered*, 987 F. Supp. 2d 82
(D.D.C. 2013), *aff'd*, 795 F.3d 200 (D.C. Cir. 2015) ......................................................... 19

*China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*,
334 F.3d 274 (3d Cir. 2003) .................................................................................. 10, 16, 17

*China Nat'l Bldg. Material Inv. Co. v. BNK Int'l LLC*,
2009 WL 4730578 (W.D. Tex. Dec. 4, 2009) ..................................................................... 19

*Commc'ns Workers of Am. v. AT&T Inc.*,
6 F.4th 1344 (D.C. Cir. 2021) .......................................................................................... 1, 7

*Corporacion Mexicana De Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-
Exploracion*
832 F.3d 92 (2d. Cir. 2016) ............................................................................................ 2, 22

*Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela*,
760 F. App'x 1 (D.C. Cir. 2019) ...................................................................................... 1, 7

*Enron Nig. Power Holding, Ltd. v. Fed. Republic of Nig.*,
   844 F.3d 281 (D.C. Cir. 2016) ................................................................1, 7

*Farmland Indus., Inc. v. Grain Bd. of Iraq*,
   904 F.2d 732 (D.C. Cir. 1990) ....................................................................12

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) .......................................................................................9

*Four Seasons Hotels & Resorts BV v. Consorcio Barr SA*,
   377 F.3d 1164 (11th Cir. 2004) ..................................................................22

*Gold Reserve, Inc. v. Bolivarian Rep. of Venez.*,
   146 F. Supp. 3d 112 (D.D.C. 2015) .............................................................9

*Keepseagle v. Vilsack*,
   102 F. Supp. 3d 205 (D.D.C 2015) ..............................................................9

*LLC SPC Stileks v. Repub. of Moldova*,
   985 F.3d 871 (D.C. Cir. 2021) .................................................7, 8, 10, 23

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) .....................................................................................20

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
   460 U.S. 1 (1983) .........................................................................................20

*Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*,
   589 F.3d 437 (D.C. Cir. 2009) .................................................................1, 7

*Nat'l Sec. Counselors v. CIA*,
   898 F. Supp. 2d 233 (D.D.C. 2012) ...........................................................21

*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
   112 F.4th 1088 (D.C. Cir. 2024) ......................................................*passim*

*NextEra Energy Global Holdings B.V. v. Kingdom of Spain*,
   656 F. Supp. 3d 201 (D.D.C. 2023) .............................................................3

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*,
   69 F. Supp. 3d 175 (D.D.C. 2014) .............................................................21

*Republic of Argentina v. AWG Grp. Ltd.*,
   211 F. Supp. 3d 335 (D.D.C. 2016), *aff'd*, 894 F.3d 327 (D.C. Cir. 2018) .............................14

*Republic of Moldova v. Komstroy LLC*
   (Sept. 2, 2021) ........................................................................................3, 19

*Rossville Convenience & Gas, Inc. v. Wilkinson*,
   2021 WL 7210779 (D.D.C. Feb. 23, 2021) ...................................................................21

*Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*,
   300 F. Supp. 3d 137,147 (D.D.C. 2018) .......................................................................9

*Russell v. Harman Int'l Indus., Inc.*,
   773 F.3d 253 (D.C. Cir. 2014) ....................................................................................21

*Stati v. Republic of Kazakhstan*,
   302 F. Supp. 3d 187 (D.D.C. 2018), *aff'd*, 773 F. App'x 627 (D.C. Cir. 2019) .......................8

*Tarzana Providence Health Sys. v. Becerra*,
   2024 WL 4006163 (D.D.C. Aug. 30, 2024) (McFadden, J.) ...................................................6

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007) ....................................................................................22

*United Media Holdings, NV v. Forbes Media, LLC*,
   2017 WL 9473164 (S.D.N.Y. Aug. 9, 2017) ......................................................................19

*Vasquez v. Agosto*,
   110 F.4th 282 (D.C. Cir. 2024) ....................................................................................21

**Foreign Cases**

*Eastern Sugar B.V. (Netherlands) v. The Czech Republic*,
   SCC Case No. 088/2004 .......................................................................................17, 18

*Slowakische Republik (Slovak Republic) v. Achmea BV*
   (Mar. 6, 2018) .......................................................................................................3, 19

*Republic of Moldova v. Komstroy LLC*
   (Sept. 2, 2021) .......................................................................................................3, 19

**Statutes**

9 U.S.C. §§ 201-208 ....................................................................................................2

28 U.S.C. § 1605(a)(6) ............................................................................................4, 6

**Other Authorities**

Energy Charter Conference, https://www.energycharter.org/who-we-are/energy-
   charter-conference/ .................................................................................................15

Swedish Arbitration Act, § 2 .......................................................................................9

Pursuant to the Court's August 22, 2024 order,[1] Petitioner Mercuria Energy Group Limited ("**Mercuria**"), by and through its undersigned counsel, respectfully submits this surreply in opposition to the motion ("**Motion to Dismiss**") by the Republic of Poland ("**Poland**") to dismiss or stay the Petition to Confirm.  Mercuria seeks recognition of an arbitral award ("**Award**") rendered against Poland following an arbitration conducted under the Stockholm Chamber of Commerce ("**SCC**") Rules ("**Arbitration**").  The Court should deny the Motion and grant the Petition for the reasons that follow.

## I.    PRELIMINARY STATEMENT

The Court of Appeals for this Circuit has conclusively established that this Court has subject matter jurisdiction to hear Mercuria's Petition.  *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024) ("*NextEra*").  While the Court of Appeals' ruling in *NextEra* concerned subject matter jurisdiction, its analysis of the issues in those cases—which are indistinguishable from the issues here—compel denial of Poland's Motion.  Specifically, because the parties in this case agreed that the Tribunal was authorized to rule on its own jurisdiction, black-letter Circuit law provides that this Court's review of any questions concerning the scope of the parties' arbitration agreement is subject to deference.  *See Commc'ns Workers of Am. v. AT&T Inc.*, 6 F.4th 1344, 1349 (D.C. Cir. 2021); *Enron Nig. Power Holding, Ltd. v. Fed. Republic of Nig.*, 844 F.3d 281, 289 (D.C. Cir. 2016); *Chevron Corp. v. Ecuador*, 795 F.3d 200, 203 (D.C. Cir. 2015); *Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*, 589 F.3d 437, 439 (D.C. Cir. 2009); *Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela*, 760 F. App'x 1,

---

[1]    On August 22, 2024, the parties filed a joint motion to, *inter alia*, grant Mercuria the opportunity to file a surreply "relating to the D.C. Circuit's recent decision in *NextEra Global Holdings B.V. et al. v. Kingdom of Spain* (No. 23-7031). ECF No. 19.  That motion was granted that same day.  The Court's order limited the scope of the surreply to the D.C. Circuit's decision in *NextEra* and its relation to this case, so this brief addresses only such issues.  Failure to address any other arguments presented by Poland's reply brief therefore should not be construed as an acceptance of such arguments, or a waiver of Mercuria's objections to such arguments.

2 (D.C. Cir. 2019).  For its part, the Court of Appeals in *NextEra* squarely ruled that the question of whether an EU-based claimant can commence arbitration against an EU member state under the Energy Charter Treaty ("**ECT**") is, indeed one of scope.  On that basis, there is simply no ground for this Court to accept Poland's invitation to discard the Tribunal's well-reasoned analysis and conclusion that the arbitration agreement at issue here was valid, or to refuse to recognize the Award.  As a result, this Court should recognize the Award and enter judgment on it, as it is treaty-bound by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, ("**New York Convention**") and the Federal Arbitration Act, 9 U.S.C. §§ 201-208, to do.

No doubt aware that U.S. law requires this outcome, Poland asks this Court to shirk its obligations under the New York Convention and, on the basis of its assumption that the Award is going to be vacated in Sweden, to refuse recognition because the Swedish court's expected annulment will result in a situation where "there will be no award left to enforce."  ECF 21 at 23. That argument, however, ignores both the plain text of the New York Convention and the D.C. Circuit's recognition that U.S. courts possess discretion to confirm a foreign arbitral award even where it has been annulled.  Should the Swedish court decide to apply the parochial and self-serving decisions of the Court of Justice of the European Union ("**CJEU**") and the political declarations of certain EU member states to retroactively deprive Mercuria of its right to arbitrate, clear U.S. public would justify this Court's exercise of discretion to recognize the Award in order to ensure that Mercuria is not left without the ability to recoup the losses it suffered as a result of the inaction of the Polish Material Reserves Agency, as such an uncompensated loss would violate "fundamental notions of what is decent and just."  *Corporacion Mexicana De Mantenimiento Integral, S. de R.L.* de *C.V. v. Pemex-Exploracion* y *Produccion*, 832 F.3d 92, 107 (2d Cir. 2016) ("**Pemex**").

2

## II.  THE D.C. CIRCUIT'S RULING IN *NEXTERA V. SPAIN*

On August 16, 2024, the Court of Appeals issued its *NextEra* decision, which adjudicated appeals from three cases in this District:  *NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, 656 F. Supp. 3d 201 (D.D.C. 2023); *9REN Holding S.A.R.L. v. Kingdom of Spain*, 2023 WL 2016933 (D.D.C. Feb. 15, 2023); and *Blasket Renewable Investments, LLC v. Kingdom of Spain*, 665 F. Supp. 3d 1 (D.D.C. 2023).  Each of these cases involved efforts by European Union ("**EU**") based investors to enforce arbitral awards issued under the ECT against Spain, an EU member state.  Spain argued in each of these cases that its "unconditional consent" to arbitrate with investors of other ECT contracting parties set out under Article 26(3) of the ECT did not and could not extend to investors from EU member states because of the CJEU's decisions in Case C-284/16, *Slowakische Republik (Slovak Republic) v. Achmea BV* (Mar. 6, 2018) ("***Achmea***") and Case C-741/19, *Republic of Moldova v. Komstroy LLC*, (Sept. 2, 2021) ("***Komstroy***").  According to Spain, it could not have agreed to arbitrate with these EU-based investors as a matter of EU law.

In *9REN* and *NextEra*, a court in this District ruled that it had subject matter jurisdiction under the FSIA's arbitration exception based on its finding that Spain and the investors agreed to arbitrate for purposes of satisfying the requirements of that exception.  Spain appealed in both cases.  In *Blasket*, another court in this District found that there was no agreement to arbitrate sufficient to support subject matter jurisdiction and dismissed the recognition action.  The three appeals were consolidated.

The Court of Appeals found the existence of an agreement to arbitrate sufficient to support the exercise of subject matter jurisdiction under the arbitration exception to sovereign immunity in each of the three cases.  *NextEra*, 112 F.4th at 1100.  Under its prior precedents, the arbitration

exception[2] requires a district court to find "three 'jurisdictional facts': (1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement." *Id.* While the plaintiff bears only a "burden of production" to establish these facts *prima facie*, the Court of Appeals found that these plaintiffs satisfied a burden of persuasion for purposes of establishing these facts. *Id.*

The only jurisdictional fact in dispute in *NextEra* (and in this case) was "the existence of an arbitration agreement." *Id.* at 1101. The Court began its analysis by identifying "the relevant arbitration agreement," which derived from the ECT. *Id.* It noted that, where the arbitration provision is found in an investment treaty, that provision "can both (1) constitute an agreement 'for the benefit' of a private party; and (2) give rise to a separate agreement "with" a private party." *Id.* It noted further, consistent with prior Circuit caselaw, that "an investment treaty's arbitration provision operates as 'a unilateral offer to arbitrate' by each sovereign to investors of the other signatory countries," which "[a] foreign investor seeking to take advantage of the investment treaty's arbitration agreement may accept . . . by 'filing . . . a notice of arbitration.'" *Id.* at 1102. The Court of Appeals recognized that "[w]hen a sovereign makes 'an agreement . . . to submit to arbitration' by entering an investment treaty with other sovereigns 'for the benefit of' a class of private investors, it is the treaty that manifests the sovereign's consent to arbitrate." *Id.*

Turning to the ECT, the Court found that the treaty "offers powerful reasons to conclude that the standing offer to arbitrate contained in the ECT's arbitration provision extends to EU nationals." *Id.* It stated that "[t]he clear terms of the ECT's arbitration provision cover '[d]isputes

---

[2]     As explained in *NextEra*, "[t]he [Foreign Sovereign Immunities Act] codifies a baseline principle of immunity for foreign states and their instrumentalities" including "the arbitration exception." 112 F.4th at 1099. Under the arbitration exception, "[w]hen a sovereign makes "an agreement . . . to submit to arbitration" by entering an investment treaty with other sovereigns "for the benefit of" a class of private investors, it is the treaty that manifests the sovereign's consent to arbitrate," the arbitration exception is met and the foreign state is not immune from suit. *Id.* at 1102 (discussing 28 U.S.C. § 1605(a)(6)).

between a Contracting Party and an Investor of another Contracting Party;'" that "Spain is undeniably a 'Contracting Party;'" and that "the companies are undeniably 'Investor[s] of another Contracting Party.'" *Id*. The Court also found a lack of textual evidence of the intra-EU exception advocated by Spain, remarking that "if the ECT's drafters nonetheless intended to exempt intra-EU disputes, they could have done so through a 'disconnection clause'—a provision stating that the treaty does not govern the relationships between EU Member States." *Id*. It noted further that "during negotiation of the ECT, the EU had proposed the insertion of a disconnection clause. **However, that clause was ultimately dropped from the draft treaty**." *Id*. (emphasis added).

Based on this analysis, the Court of Appeals determined that the ECT itself identified "the scope of the sovereign's consent and the relevant agreement for purposes of the FSIA's arbitration exception," *id*. at 1102, and because Spain "entered into an arbitration agreement—the Energy Charter Treaty itself—that is arguably "for [the] benefit [of the plaintiffs]," *id*., the FSIA's arbitration exception was satisfied. Critically, the Court of Appeals found Spain's argument that it did not agree to arbitrate with investors from other EU member states was one concerning the "**scope**" and not the "**existence**" of an agreement to arbitrate, as "Spain does not dispute that it is a signatory to the Energy Charter Treaty," and "it is common ground that, in ratifying the ECT, Spain provided 'unconditional consent' to arbitrate investment disputes with the investors of at least some of the other signatory nations." *Id*. (emphasis added).

The Court of Appeals' ruling in *NextEra* controls, and its finding that Spain's argument is one of "scope" and not the "existence" of an agreement to arbitrate is dispositive. Courts—including the D.C. Circuit—have squarely and repeatedly held that where questions on arbitral jurisdiction turn on "scope" (as opposed to the existence of an agreement), deference must be given to the tribunal's jurisdictional determinations, so long as the parties agreed that the arbitrators

would be empowered to rule on their own jurisdiction.  *Id.* at 1104.[3]  *NextEra*'s characterization of the contract issues as scope issues thus fatally undercuts Poland's argument that it did not agree to arbitrate.  As that question is one of scope, this Court must defer to the Tribunal's jurisdictional findings, which held Poland agreed to arbitrate.

## III.    ARGUMENT

### A.    POLAND FAILS TO MEET ITS BURDEN TO DEMONSTRATE THAT THE AWARD SHOULD NOT BE RECOGNIZED UNDER ARTICLE V OF THE NEW YORK CONVENTION

#### 1.    This Court Should Defer to the Tribunal's Findings Concerning the Scope of an Agreement to Arbitrate

Poland argues in its reply brief ("**Reply**") (ECF 21) that, notwithstanding the D.C. Circuit's determination that the ECT itself evidences the "existence" of an agreement to arbitrate as a jurisdictional fact, that fact should be disregarded for purposes of determining whether an agreement to arbitrate exists for purposes of Article V(1)(A) of the New York Convention.  ECF 21 at 14.  Poland's attempts to de-couple the D.C. Circuit's findings in *NextEra* from this Court's consideration of the enforceability of the Award are nonsensical and contrary to the law of this Circuit.  While the *NextEra* panel expressly declined to "take [a] position on the ultimate enforceability of these awards" (112 F.4th at 1105), its decision cannot be viewed in a vacuum without reference to this Circuit's existing precedents.  Applying those precedents, it is clear that the findings in *NextEra* are conclusive not just as to subject matter jurisdiction under 28 U.S.C. §1605(a)(6), but also with respect to whether the Award may (and, in fact, must) be recognized.

As noted above, the Court of Appeals made two controlling observations in *NextEra* that undermine Poland's arguments concerning the existence of a valid agreement to arbitrate.  **First**,

---

[3]    Poland's criticism of the *NextEra* decision is futile because the decision is binding on this Court. *See, e.g., Tarzana Providence Health Sys. v. Becerra*, 2024 WL 4006163, at *6 (D.D.C. Aug. 30, 2024) (McFadden, J.) ("the Court has no liberty to ignore the Circuit's command").

the "unconditional consent" to arbitrate with investors of another contracting state establishes the "existence" of an agreement to arbitrate as a jurisdictional fact. *Id*. at 1102.  Relatedly, Spain's argument (like Poland's here) that "the standing offer to arbitrate contained in Article 26 of the ECT does not extend to EU nationals like the [claimants in the consolidated cases]" is "an argument regarding the **scope** of the Energy Charter Treaty, not its **existence**."  *Id*. at 1103 (emphasis in original).

 **Second**, after determining that Spain's arbitrability objections went only to the scope of its consent to arbitrate, the D.C. Circuit recognized in *NextEra* that the relevant "arbitration regimes" set out in Article 26(4) of the ECT "delegate to the arbitral tribunal the power to decide threshold issues of arbitrability."  *Id.* at 1096.  This was not an idle observation.  D.C. Circuit precedent consistently holds that when parties delegate arbitrability to an arbitral tribunal, U.S. courts owe "considerable deference" to the arbitral tribunal's jurisdictional rulings.  *Enron Nig. Power Holding*, 844 F.3d at 289 (holding in a New York Convention case "'considerable deference' is to be afforded by the enforcing court to the arbitrator's interpretation and application of the parties' contract.") (citing *BG Grp. PLC v. Republic of Arg.*, 572 U.S. 25, 41 (2014)); *see also Commc'ns Workers of Am.*, 6 F.4th at 1347-48 ("[W]hen there is such an assignment, Supreme Court precedent forbids courts from speaking to the question of arbitrability and requires leaving it strictly to the arbitrator. . ."); *Nat'l Postal Mail Handlers Union*, 589 F.3d at 439 (where parties delegated arbitrability, the court owed substantial deference to the arbitrator's determination); *Chevron Corp.*, 795 F.3d at 207-08 (same); *Crystallex Int'l Corp.*, 760 F. App'x 1, 2 (same).

 The D.C. Circuit's express finding in *NextEra* that Spain's objection went to the scope, and not the existence, of an agreement to arbitrate is outcome-determinative here, as demonstrated by the Circuit's decision in *LLC SPC Stileks v. Repub. of Moldova*, 985 F.3d 871 (D.C. Cir. 2021).

In *Stileks*, Moldova—like Spain in *NextEra* and Poland here—argued that "[a]lthough the ECT may establish that Moldova agreed to arbitrate certain disputes, it does not prove that it agreed to arbitrate this **particular dispute**." *Stileks,* 985 F.3d at 878 (emphasis in original).  The Court of Appeals found that this argument ultimately concerned the "scope" and not the "existence" of an agreement to arbitrate, and that the existence of an agreement to arbitrate "derived from Moldova's signature on the treaty itself." *Stileks,* 985 F.3d at 879.  After the district court found it had subject matter jurisdiction under the FSIA's arbitration exception, the Court of Appeals considered the merits of Moldova's defense under the New York Convention:  that Moldova's consent to arbitrate did not extend to investors like Energoalliance.  *Id.* at 879.  The Court of Appeals found, as a preliminary matter, that the U.S. courts had no ability to independently assess this question because "[u]nder Article 26 of the ECT" Moldova had consented to arbitrate in accordance with the UNCITRAL Rules of Arbitration, if chosen by the investor (and which were chosen by Energoalliance).  *Id.* at 878.  Accordingly, by virtue of its status as a Contracting Party to the ECT, "Moldova agreed to assign arbitrability determinations to the tribunal."  *Id*.  On the basis of that finding, the D.C. Circuit held it was required to accept the arbitrators' determination concerning whether Energoalliance was a qualifying investor for purposes of commencing arbitration.  *Id.* at 879.[4]

Stileks is on all fours with this case, and the same result should obtain.  Poland's arbitrability argument is identical to that asserted by Moldova—that "the offer of arbitration in

---

[4]    Other cases from this District likewise applied this delegation principle to reject an award debtor's arguments concerning the existence or scope of the alleged agreement to arbitrate under Article V(1)(a) of the New York Convention.  *See, e.g., Stati v. Republic of Kazakhstan*, 302 F. Supp. 3d 187, 203, 204 (D.D.C. 2018), *aff'd*, 773 F. App'x 627 (D.C. Cir. 2019) (after finding the existence of an agreement to arbitrate for purposes of FSIA jurisdiction and that such agreement delegated arbitrability to arbitrators, the court rejected Kazakhstan's Article V(1)(a) defenses, as "[t]he tribunal rejected it" so "[t]he Court finds no reason to second-guess the tribunal's conclusion."); ; *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 157-58 (D.D.C. 2018) (rejecting Ghana's Article V(1)(a) argument that the arbitration agreement was invalid under Ghanaian law because "the same argument" was rejected by court for purposes of determining application of arbitration exception under FSIA, and arbitration agreement delegated arbitrability to arbitrators).

Article 26 **does not permit [EU Member States'] investors to bring claims against other EU Member States**."  ECF 21 at 21 (emphasis in original).  As a contracting party to the ECT, Poland agreed to be bound by Article 26(3), which expressly provides that "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration. . .."  Poland does not contest that the "unconditional consent" contained in Article 26(3)(a) authorizes an investor to elect arbitration under the SCC Rules,[5] and that Mercuria selected this option.  Poland also does not contest that the Tribunal was authorized to rule on the scope of its own jurisdiction, a fact "undisputed between the parties" in the Arbitration.  Award ¶ 252.[6]  This Court is thus not permitted to scrutinize the Tribunal's thorough and well-reasoned findings that Poland was capable of arbitrating this dispute and that the arbitration agreement was valid under Swedish and international law; to the contrary, this Court is bound to accord those findings substantial deference.  *See Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, 300 F. Supp. 3d 137,147 (D.D.C. 2018) ("When the parties have committed the jurisdictional determination to the arbitrator, courts 'should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances.'") (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)); *Gold Reserve, Inc. v. Bolivarian Rep. of Venez.*, 146 F. Supp. 3d 112, 120 (D.D.C. 2015) (recalling that courts owe arbitral tribunals "substantial deference"); *see also* cases cited *supra* at 7.

Simply put, *NextEra*'s analysis and application of prior precedent fatally undermines Poland's attempts to frame its arbitrability objection as one going to the existence of an arbitration

---

[5]    As a matter of law, Poland delegated consideration of its Article V(1)(a) invalidity and incapability arguments to the Tribunal. *See* Opposition at 21-23. By failing to contest or address this argument in its Reply, Poland has conceded the point. *See, e.g., Keepseagle v. Vilsack*, 102 F. Supp. 3d 205, 220 (D.D.C 2015) (plaintiff "abandoned the entire argument in their reply brief by failing to respond to **any** of [defendant's] points").

[6]    Section 2 of the Swedish Arbitration Act (which is applicable as a matter of law to all SCC arbitrations) unambiguously provide: "The arbitrators may rule on their own jurisdiction to decide the dispute." Award ¶ 252.

agreement.  It is, as a matter of Circuit law, a scope objection.  And because Poland agreed (and Swedish law provides) that the Tribunal was authorized to rule on its own jurisdiction—including on the existence of the agreement to arbitrate—this Court is obligated to accord the Tribunal's finding substantial deference.[7]

### 2.  Poland's Article V(1)(A) Arguments Must Be Rejected

#### a)  The Arbitration Agreement Is Valid Under the "Law to Which the Parties Have Subjected" the Arbitration Agreement

Even if the Court conducts a review of the validity of the arbitration agreement at issue here—and it should not—it should reach the same conclusion as the Tribunal and reject Poland's argument that recognition of the Award may be denied under Article V(1)(A), which permits (but does not require) an enforcement court to deny recognition where "the parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or . . . under the law of the country where the award was made."  Poland does not contest that the governing law for purposes of assessing the validity of the parties' agreement to arbitrate under Article V(1)(A) is "the law to which the parties have subjected [their agreement]," which in this case is international law.  ECF 9 at 29.

As noted above, the D.C. Circuit remarked in *NextEra* that the ECT itself "offers powerful reasons to conclude that the standing offer to arbitrate contained in the ECT's arbitration provision extends to EU nationals."  112 F.4th at 1102.  On this point, the Court of Appeals held that "if the ECT's drafters . . . intended to exempt intra-EU disputes, they could have done so through a 'disconnection clause'" and noted that during the negotiations that led to the conclusion of the

---

[7]     Poland cites *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274 (3d Cir. 2003) to argue that *de novo* review is appropriate here.  In that case, the Third Circuit refused to apply a delegation agreement in the face of a dispute concerning the **existence** of an agreement to arbitrate.  That critical distinction renders *China Minmetals* inapposite.  To the contrary, the D.C. Circuit's decision in *Stileks* controls here.

ECT, the EU sought the inclusion of such a clause but it "was ultimately dropped from the draft treaty." *Id*. (citation omitted). These facts, of course, apply equally to this case, and as Professor Bjorklund has explained, these are significant, if not dispositive, facts for purposes of establishing that Poland agreed to arbitrate with Mercuria. Expert Declaration of Andrea K. Bjorklund (ECF 16) ("**Bjorklund**") ¶ 70. This is because, in the absence of any express indications in the text of the treaty, "neither third states nor the EU member states themselves negotiating the ECT could have been expected to understand that the obligations they were undertaking were not in fact being undertaken as between the EU member states themselves . . ."). *Id*. Another critical fact indicating the EU's willingness to abide by the terms of the ECT as written is that **the EU itself is a party to the ECT**. *See e.g. id.* ¶ 68. The international law principle of good faith would have prevented the EU from ratifying an agreement it knew (and/or its member states knew) could not be complied with as written. *Id*. Poland's attempts to discount the relevance of the D.C. Circuit's findings are ineffective, for the following reasons.

> **(1)** **The 2019 and 2024 Declarations Are Irrelevant to Demonstrate the Intent of the ECT Contracting Parties**

Poland seeks to rely on *BG Group* to argue that this Court must look to the parties' intent when interpreting a treaty, and argues that certain EU member states' declarations in 2019 and 2024 are the "best evidence" of their intent. ECF 21 at 15-16. Poland's argument suffers from multiple fatal flaws. **First**, while relying on *BG Group*, Poland ignores the Supreme Court's admonition that when a treaty's text is clear, a court should go no further in assessing the parties' intent. *BG Grp.,* 572 U.S. at 34. Poland does not allege any ambiguity in the text of Article 26(3) (there is none), yet it nonetheless asks this Court to read an unwritten exception into the "unconditional consent" embodied in that provision based on the CJEU's recent proclamations of EU law. This argument fails simply for the lack of any ambiguity in Article 26.

**Second**, it is equally clear under contract interpretation principles that the 2019 and 2024 declarations do not show the parties' intentions **at the time the ECT was concluded and ratified**. The declarations, issued 15 and 20 years after the ECT was ratified, at a time when EU member states were facing billions of dollars in liabilities resulting from ECT arbitration awards held by European investors, cannot be viewed as anything more than self-interested, *post hoc* attempts to avoid the consequences of their previously agreed contractual obligations and, likely, to influence arbitration tribunals and courts. *See e.g.*, *Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 280 (D.C. Cir. 2014) (party's hindsight view of contract as improvident does not justify rewriting the contract's terms); *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990) (contemporaneous evidence is best evidence of the parties intent).

**Third**, the evidence simply does not prove what it purports to, as neither the 2019 nor the 2024 declarations reflect a unanimous approach to the interpretation of Article 26 among ECT contracting parties, let alone among EU member states at the time they were issued.  Bjorklund ¶¶ 82-85 (regarding the 2019 declarations and explaining, *inter alia*, that six EU member states, including Sweden, did not believe intra-EU arbitration under the ECT was incompatible with EU law); *id.* ¶ 86 (regarding the 2024 declarations and explaining Hungary's position that only from then on would Article 26(2)(c) of the ECT preclude intra-EU arbitration).

**Fourth**, international law interpretive tools further undermine the evidentiary weight of the declarations.  Article 31 of the Vienna Convention requires the interpreter of a multilateral treaty "to ascertain the common intentions of the parties" which "cannot be ascertained on the basis of the subjective and unilaterally determined 'expectations' of **one** of the parties to a treaty." Bjorklund ¶ 88 (internal quotations omitted).  So, even if EU member states had been unanimous in their views on intra-EU arbitration under the ECT—and they were not—their views alone

cannot represent an authoritative interpretation of the scope of the consent set out under ECT Article 26(3), since the ECT is a treaty between countries including non-EU member states. This point is buttressed further by the inclusion of Article 42 of the ECT, which precludes *inter se* modifications—*i.e.*, modifications between some, but not all, of the parties—and requires modifications to undergo a formal amendment process that includes adoption by **all** Contracting Parties. *Id.* ¶ 90. Thus, Poland's argument that its 2004 entry into the EU implicitly modified the scope of **its** consent under Article 26(3) must fail, because "any implicit understanding by the EU Member States and the EU itself that some provisions of the ECT, including the ability to submit claims to arbitration, did not or do not apply as between themselves **would be simply ineffective to change the Treaty**." *Id.* ¶ 91 (emphasis added).

### (2) The Absence of a Disconnection Clause Was Intentional and Represents the Best Evidence of the Parties' Agreement

Poland tries to minimize *NextEra*'s observation that the ECT lacks a disconnection clause, arguing that it was "simply unnecessary" as it was "already clear" that intra-EU arbitration was impermissible under the treaty.[8] ECF 21 at 18. This argument is hardly colorable. International law recognizes, as did the Court of Appeals in *NextEra*, that because the ECT contains no "disconnection clause," there is no basis for carving out intra-EU disputes from Article 26. ECF 13 at 27; *see also* Expert Declaration of Sir Alan Dashwood (ECF 17) ("**Dashwood**"), ¶ 39, n.34; Bjorklund ¶ 62. Poland's effort to explain the absence of a disconnection clause by arguing that the drafters of the ECT did not find it necessary to include such a clause because all Contracting Parties to the ECT were "aware" of the implicit prohibition on intra-EU arbitration is contradicted

---

[8] Poland bases its argument in this regard on the fact that the law governing the ECT is "international law," and its flawed assumption that "EU law" is "international law." ECF 21 at 18. This false equivalence is illustrated by the fact that the specific sources of law upon which Poland relies to support its objections to arbitration are provisions of domestic constitutional law, not international law.

by Poland's own conduct:  As noted by Mercuria in its opposition, when Mercuria first commenced arbitration against Poland under the ECT in 2008, Poland **never objected** to the tribunal's jurisdiction on the grounds that intra-EU arbitration was prohibited under the ECT.  ECF 13 at 6.

Poland attempts to sidestep these realities by arguing that "it has always been understood by the Parties" that "special rules" (unwritten ones) apply between EU member states, and suggests that the ECT's definition of the term "Regional Economic Integration Organization" ("**REIO**") in ECT Article 1(10) somehow permits EU member states to "apply different rules among their constituent members."  ECF 21 at 18.  It is difficult to follow the logic of Poland's argument on the basis of Article 1(10), which does no more than define the term "Area" as used in the treaty, and mentions the term REIO only to explain that, with respect to an REIO, "Area means the Areas of the member states of such [REIO], under the provisions contained in the agreement establishing that [REIO]."  ECT, Art. 1(10).  As the Tribunal reasoned: "the fact that the EU itself is a Contracting Party to the ECT [is a Regional Economic Integration Organization] does not affect the individual standing of EU Member States, such as Poland and Cyprus, as Contracting Parties to the ECT.  **Nothing in Article 26—or elsewhere in the ECT—suggests that 'Contracting Party' means something different in the context of intra-EU arbitration**." *Id.* ¶ 374 (collecting cases, emphasis added).  ECF 1-5 at ¶¶ 279, 297-298, 374.  The Tribunal's finding is fully consistent with the ECT's text, and this Court is obligated to defer to it.  *Republic of Argentina v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335, 344 (D.D.C. 2016), *aff'd*, 894 F.3d 327 (D.C. Cir. 2018) (holding that "the level of deference" is "high" and "courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." (internal citations omitted)).

Finally, as Professor Bjorklund explains, in 2022 the Energy Charter Conference[9] considered an amendment to the ECT that would disapply Article 26 among Contracting Parties that were members of the same REIO.  ECF 21-1, at § 6.   Contrary to Poland's efforts to characterize that amendment as a "clarification" that was "adopted" by the Conference, that amendment is only an "agreement in principle" that was made "without prejudice regarding its final assessment by the Contracting Parties."  *Id.*   That agreement in principle would only "enter into force 90 days after the ratification by three-fourths of the Contracting Parties."  *Id*.  Critically, it was never ratified.  ECF 16 at ¶ 96.  Furthermore, no such amendment would be necessary if, as Poland contends, all Contracting Parties "already understood" that Article 26 did not apply as between EU member states.  *Id*.

> **b)    Poland Was Not Incapable of Consenting to Arbitrate with Mercuria Under the "Law Applicable to" the Parties**

> **(1)    Under International Law Poland Had Capacity to Arbitrate with Mercuria**

In its Reply, Poland pursues a secondary line of attack, alleging it was "under some incapacity" to agree to arbitrate with Mercuria "under the law applicable to [it]," which Poland alleges is EU law.  ECF 21 at 13.  This argument also fails.

For purposes of assessing whether Poland lacked capacity to agree to arbitrate with Mercuria, the "law applicable to Poland" must be international law, not EU law.  Poland does not contest that it was at all relevant times a Contracting Party to the ECT, that the relevant arbitration clause in this dispute is Article 26, which contains an "unconditional consent" to arbitration (*see* ECF 21 at 19, 21), and that the ECT is an international law instrument (*see* ECF 21 at 9; Bjorklund Decl. ¶ 39) that is itself governed by international law.  As a result, the law applicable to Poland

---

[9]    The Energy Charter Conference is the governing and decision-making body for the Energy Charter Treaty.  *See* "Energy Charter Conference," https://www.energycharter.org/who-we-are/energy-charter-conference/.

for purposes of evaluating its capacity to adhere to the ECT's provisions as a Contracting Party is international law.  Bjorklund ¶ 120.  As Professor Bjorklund explained, "'applicable rules and principles of international law' to which Article 26(6) refers must also govern the agreement to arbitrate" because "[i]t would be perverse should the analysis of whether there was an agreement to arbitrate depend[ed] on the particular Investor's choice of arbitral rules set forth under ECT Article 26(4)." *Id.* ¶ 128.  Poland's interpretation risks making the location of the "seat" the driving factor of whether the parties' formed a valid arbitration agreement under the ECT—a result which hardly could have been something that parties to a multilateral treaty such as the ECT could have intended.  *Id.*  This principle applies equally to Poland's "incapacity" argument, which goes to the validity of its express consent to arbitrate.

Poland's reliance on *China Minmetals* in this respect is entirely misplaced.  Poland cites *China Minmetals* for the proposition that a claim of incapacity must be determined by the law of the place where the party is incorporated, but the Third Circuit's decision did not actually hold this.  The Court in that case applied New Jersey law (where Chi Mei was incorporated) **only** to the issue of whether the party opposing enforcement had waived its jurisdictional arguments by participating voluntarily in the arbitration.  334 F.3d at 290-91.  *China Minmetals* did not involve any interpretation of the meaning of Article V(1)(a), or the specific phrase "law applicable to [the parties]."  Moreover, that case centered on a party's claim that the arbitration agreement had been forged, and whether the forgery question was an issue for the court or the arbitrators to decide.  *Id.* at 286.  However, as established above and in *NextEra*, the issue presented by Poland does not concern the "existence of an agreement" but rather its scope.  *China Minmetals* confirms that objections concerning the scope of arbitrability are properly left to the arbitrators, particularly

where—as here—the consent to arbitrate incorporated an agreement to arbitration regimes providing for the arbitrator's competence to determine their own jurisdiction. *Id.* at 288.

For the reasons already explained by Professor Bjorklund, Poland had the capacity to extend the "unconditional consent" under Article 26(3) of the ECT to Mercuria. *See* Bjorklund ¶¶ 140-143.  Poland is a party to the ECT, and even assuming EU law is "a part" of international law, under the plain language of the ECT, the contracting parties agreed international law would supersede domestic law—including EU law—in the event of any conflict. *Id.* ¶¶ 97-102.  As a result, EU law cannot be used to unwind Poland's "unconditional consent". *Id.* ¶ 103.

### (2)   Under EU Law Poland Had Capacity to Arbitrate with Mercuria

Even under EU law, Poland has not shown that it was incapable of forming an agreement to arbitrate with Mercuria.  It is not apparent that Poland's argument is truly an "incapacity" claim, as Poland does not dispute that it had the capacity to—and in fact did—sign and ratify the ECT. Instead, Poland claims that complying with the treaty's agreement to arbitrate vis-à-vis EU investors would violate EU law.  The consequences of any such violation, however, must be borne by Poland.  As Professor Dashwood explained, placing that burden on Mercuria would itself violate principles of EU law by permitting Poland to benefit from its own wrongdoing in signing a treaty it could not comply with.  Dashwood ¶ 127.

Indeed, the European Commission's own decisions in a similar matter shows conclusively that EU member states like Poland have the capacity to agree to arbitrate with intra-EU investors. In *Eastern Sugar B.V. (Netherlands) v. The Czech Republic*, SCC Case No. 088/2004 (ECF 10-9) ("***Eastern Sugar***"), an SCC arbitration brought under a bilateral investment treaty between the Czech Republic and The Netherlands ("**BIT**"), Dutch investor Eastern Sugar commenced an SCC arbitration against the Czech Republic for violation of the BIT.  The Czech Republic joined the

EU in 2004 (like Poland), when it was already a party to the BIT.  In the arbitration, the Czech Republic argued that once it joined the EU, it was no longer capable of arbitrating with Eastern Sugar, an investor from another EU member state.  *Eastern Sugar* ¶ 112.  Perhaps in hopes of bolstering its jurisdictional objection, the Czech Republic requested the European Commission's guidance concerning whether it had the capacity to engage in intra-EU arbitration.  *See id.* ¶ 119.

In a ruling that badly undermines Poland's position here, the European Commission responded that the Czech Republic did have the right to engage in intra-EU arbitration.  *Id.*  The Commission informed the Czech Republic that, even if there was a conflict between EU law and the Czech Republic's offer to arbitrate contained in BIT (which the Commission, interestingly, did not definitively concede at the time), "this would not entail the automatic termination of the concerned BIT" and instead the Czech Republic "would have to follow the relevant procedures" because "[s]uch termination cannot have a retroactive effect."  Bjorklund ¶ 72 (quoting *Eastern Sugar*, ¶ 119 (alterations in original)).  In other words, the European Commission found the Czech Republic had the capacity to, and indeed did, agree to arbitrate under the BIT, and that agreement could not be automatically invalidated by an alleged conflict between EU law and the BIT.  Rather, that conflict merely obligated the Czech Republic to terminate its participation in the BIT to bring its international obligations in line with EU law.  Until such time as that termination process was completed, the Czech Republic would have to abide by its agreement to arbitrate.[10]

### (3)     Poland Had Capacity to Agree to Arbitrate at the Time It Signed and Ratified the ECT

Poland's incapacity argument fails for still another reason.  "[F]or purposes of Article V(1)(a), a party's 'incapacity' is determined at the time of the agreement rather than at the time of

---

[10]     More recently, in 2015 the European Commission directed EU member states "to abrogate their intra-EU BITs," and "[w]hen most failed to do so, the Commission launched infringement proceedings against several of those States."  Bjorklund ¶ 73.  These infringement proceedings "would not be necessary were the treaties themselves," or the arbitration clauses contained therein, "negated simply by their incompatibility with EU law."  *Id.*

the arbitration." *United Media Holdings, NV v. Forbes Media, LLC*, 2017 WL 9473164, at *10 (S.D.N.Y. Aug. 9, 2017) (citing *China Nat'l Bldg. Material Inv. Co. v. BNK Int'l LLC*, 2009 WL 4730578, at *5-6 (W.D. Tex. Dec. 4, 2009) ("[T]he incapacity defense requires the challenging party to prove it was under an incapacity **at the time the agreement was entered into**, **not at the time of the arbitration proceeding**") (emphasis added)); *see also BCB Holdings Ltd. v. Gov't of Belize*, 232 F. Supp. 3d 28, 47 (D.D.C. 2017) ("[A] challenge brought under Article V(1)(a) must be brought against the agreement to arbitrate").  In *United Media Holdings*, because the petitioners "offered no evidence that they suffered from any incapacity at the time the License Agreement was signed," the court rejected their Article V(1)(a) claim.  2017 WL 9473164, at *10.  And in *China Nat'l Bldg.*, the court similarly rejected the Article V(1)(a) defense because there was no evidence that the defendant "was suffering under any incapacity at the time it entered into the Agency Agreement."  2009 WL 4730578, at *6.

In the investment treaty context, the D.C. Circuit has held that the timing considerations surrounding the formation of an agreement to arbitrate are somewhat different than in a more typical commercial context.  As explained in *Chevron Corp. v. Republic of Ecuador*, "the [treaty] constitutes [the State's] 'standing offer' to arbitrate," and once an investor submits its notice of arbitration and has therefore "submitted an 'investment dispute'" there is a "a binding arbitration agreement" between the parties.  949 F. Supp. 2d 57, 66–67 (D.D.C. 2013), *judgment entered*, 987 F. Supp. 2d 82 (D.D.C. 2013), *aff'd*, 795 F.3d 200 (D.C. Cir. 2015).  The host state gives its consent to arbitrate when it signs and ratifies the treaty, *id.*, and so for purposes of assessing any claim of "incapacity," the relevant inquiry is when it ratified the treaty.  Poland had signed and ratified the ECT in November 2000—well before *Achmea* or *Komstroy* were decided, and when Poland was not a member of the EU.  Illustrating the point even further, four years **after** Poland ratified the

ECT, the European Commission held that the Czech Republic was bound by an arbitration agreement it made with an EU-based investor under a BIT. *See supra* at 17-18. In sum, there is no evidence to suggest that Poland was under any incapacity to agree to arbitrate with investors from EU member states when it ratified the ECT.

### 3. The Award Does Not Violate U.S. Public Policy (Article V(2)(b))

#### a) Enforcement of the Award Poses No Comity Concerns

Poland argues that because the D.C. Circuit found in *NextEra* that enforcement of intra-EU ECT awards is "of extraordinary importance to [the European Commission] because they 'implicat[e] the structure of the EU legal order, the role and jurisdiction of EU courts, the interpretation of EU law by non-EU adjudicatory bodies, and the future of the Energy Charter Treaty and investor-State arbitration within the EU," this Court should decline to enforce not only this, but any other intra-EU award. ECF 21 at 21. Poland over reads and misapprehends the D.C. Circuit's statement, which was made in the context of its review of an anti-suit injunction, and **not** in connection with the validity of the arbitration agreement. *See NextEra*, 112 F.4th at 1108-09.

As Mercuria demonstrates in its Opposition, Poland has not made any showing whatsoever that U.S. public policy would be offended by this Court's recognition of the Award. ECF 13 at 33-37. To the contrary, enforcement of the Award is consistent with U.S. public policy favoring prompt enforcement of arbitration awards and is required under the New York Convention, which imposes a **mandatory duty** on contracting states to recognize and enforce foreign arbitration awards which, like the Award here, are not subject to an Article V defense. *E.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, (1985) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration" (quoting M*oses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983)); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 32 (D.D.C. 2013), *aff'd*, 794 F.3d 99 (D.C. Cir. 2015)

("[T]he D.C. Circuit has given . . . a very clear template as to what is to be done . . . the District Court shall confirm unless one of the grounds for either stay or non-enforcement under the [New York] convention is established."); *see also* New York Convention, art. III ("Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon . . .").

> **b)      The Foreign Sovereign Compulsion Doctrine Does Not Apply[11]**

Poland argues, for the first time in its Reply, that the Court should decline to recognize the Award under the foreign sovereign compulsion doctrine because payment of the Award would amount to illegal state aid under EU law.  Poland supports this new argument with a second declaration from Professor Hindelang.  ECF 21 at 20.  Putting aside that Poland still does not explain how this Court's recognition of the Award would cause it to suffer "severe sanctions" under the EU's state aid regime,[12] this is a new argument raised for the first time on reply, and should not be considered by this Court.  *Vasquez v. Agosto*, 110 F.4th 282, 288 n.1 (D.C. Cir. 2024) ("Arguments raised for the first time on reply are forfeited; therefore, we do not address it here."); *Russell v. Harman Int'l Indus., Inc.*, 773 F.3d 253, 255 n.1 (D.C. Cir. 2014) ("[A]rguments raised for first time in reply brief are forfeited." (citation omitted)); *Rossville Convenience & Gas, Inc. v. Wilkinson,* 2021 WL 7210779, at *2 (D.D.C. Feb. 23, 2021) ("Generally, arguments raised for the first time on reply are waived.").  Should the Court wish to consider Poland's belated

---

[11]   Poland's Reply does not attempt to show that the foreign sovereign compulsion is a defense available to states.  *See* ECF 21 at 19-20.  Poland's failure to contest the availability of this defense should be treated as Poland conceding the point.  *Nat'l Sec. Counselors,* v. CIA, 898 F. Supp. 2d 233, 268 (D.D.C. 2012) ("[T]he Court may treat the plaintiff's failure to oppose the defendant's . . . arguments as a decision to concede those arguments."); *see also Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 226 (D.D.C. 2014) ("[A] party appeared to concede an argument by not addressing it in the reply brief.").

[12]   Poland's obligation to pay the Award already exists, and Poland does not suggest that it intends to voluntarily comply with any judgment this Court issues recognizing the Award.  Thus, it is difficult to understand how the EU's state aid regulations would put Poland in any further jeopardy if the Award were recognized by this Court.

foreign sovereign compulsion doctrine defense, Mercuria respectfully requests the opportunity respond to that argument in a brief further reply.

### B.    THIS COURT HAS DISCRETION TO CONFIRM THE AWARD NOTWITHSTANDING THE APPLICABILITY OF ANY GROUND FOR NON-RECOGNITION

In *NextEra*, the D.C. Circuit reiterated the well-settled proposition that this Court must confirm the Award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." 112 F.4th at 1098.  Poland, however, misleads concerning the Court's discretion to recognize the Award in the event one or more Article V defenses.  *See, e.g., Pemex*, 832 F.3d 92; *Four Seasons Hotels & Resorts BV v. Consorcio Barr SA*, 377 F.3d 1164, 1171-72 (11th Cir. 2004) ("even if the court finds that Article V(1)(a) applies, the court must exercise its discretion to determine whether confirmation nevertheless is appropriate." (citation omitted)).  For present purposes, Petitioner notes that Poland suggests in its reply that if the Swedish courts annul the Award, there would "be no Award left to enforce," ECF 21 at 23, leaving the incorrect impression that if such an annulment occurs, the Petition must be denied.

This is, of course, incorrect under *Pemex*, which recognizes that U.S. courts retain discretion to recognize and enforce awards even upon finding the application of a ground for non-recognition under Article V of the New York Convention.  *Pemex*, 832 F.3d at 106-07; *see also TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007).  This discretion derives from Article V itself which provides that "if one of the defenses is established, the district court **may** choose to refuse recognition of the award."  *Pemex*, 832 F.3d at 106 (emphasis in original) (finding the district court did not abuse its discretion in confirming arbitral award despite Mexican court annulment).  Although *Pemex* and *TermoRio* concerned an award debtor's objections to recognition under Article V(1)(e), the text of the Convention makes clear that this

discretion exists in respect to any of the Article V grounds.  Because, Mercuria has already demonstrated that the Award has not been "suspended" within the meaning of Article V(1)(e) of the New York Convention, and that the award has not been annulled or set aside, any discussion of the consequences of annulment are premature.  While Mercuria strongly disagrees with Poland's argument that the CJEU's decisions cannot be considered retroactive applications of the law (ECF 21 at 6-7) because they were not later-enacted legislative decisions, and submits that those arguments are both incorrect and irrelevant under *Pemex*, those arguments—as well as any argument concerning whether this Court's refusal to recognize the Award would leave Mercuria without a remedy—should be the subject of separate briefing to be scheduled if and when the Swedish courts set aside the Award (or this Court finds that Poland has established a valid Article V defense on the merits, which, for the foregoing reasons, it should not).

### C.   POLAND'S *FORUM NON CONVENIENS* ARGUMENT MUST BE REJECTED

Despite the D.C. Circuit's clear precedents, including *NextEra*'s holding that "*forum non conveniens* is not available in proceedings to confirm a foreign arbitral award," 112 F.4th at 1105 (quoting *Stileks*, 985 F.3d at 876 n.1), Poland argues this Court should dismiss this case on grounds of *forum non conveniens*.  This argument is plainly foreclosed.

## IV.   CONCLUSION

For the foregoing reasons, Mercuria respectfully requests that the Court deny Poland's Motion, grant Mercuria's Petition, and enter judgment accordingly.  ECF 1 at 14.


Dated:  New York, New York
          September 20, 2024

                              Respectfully submitted,

                               _/s/ James E. Berger_____
                              James E. Berger (D.C. Bar No. 481408)
                              Charlene C. Sun (D. C. Bar No. 1027854)

Erin Collins (D.C. Bar No. 1781667)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 335-4715
Fax: (212) 884-8715
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com
erin.collins@us.dlapiper.com

John C. Canoni (*pro hac vice*)
Tel: (214) 743-4500
Fax: (214) 743-4545
1900 N. Pearl St, Suite 2200
Dallas, Texas
john.canoni@us.dlapiper.com

*Attorneys for Petitioner*