# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

MERCURIA ENERGY GROUP LIMITED,

                Petitioner,

      v.

REPUBLIC OF POLAND,

                Defendant.

Civil Action No. 1:23-cv-03572

**Hon. Trevor N. McFadden**

**ORAL ARGUMENT REQUESTED**

## PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO RESPONDENT'S
## MOTION TO DISMISS AND OPPOSITION TO THE PETITION

DLA PIPER LLP (US)
James E. Berger (D.C. Bar No. 481408)
Charlene C. Sun (D.C. Bar No. 1027854)
Erin Collins (D.C. Bar No. 1781667)
Tel: (212) 556-2200
Fax: (212) 556-2222
1251 Avenue of the Americas
New York, NY 10020
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com
erin.collins@us.dlapiper.com

John C. Canoni (*pro hac vice*)
Tel: (214) 743-4500
Fax: (214) 743-4545
1900 N. Pearl St, Suite 2200
Dallas, Texas
john.canoni@us.dlapiper.com

*Attorneys for Petitioner*

# TABLE OF CONTENTS

I.  Preliminary Statement ................................................................................................. 1

II.  Background ............................................................................................................... 6

    A.  The Energy Charter Treaty ................................................................................ 6

    B.  Mercuria's Investments in, and Disputes with, Poland ................................... 8

    C.  The ECT Arbitrations ....................................................................................... 9

        1.  The First ECT Arbitration ......................................................................... 9

        2.  The Second ECT Arbitration ..................................................................... 9

    D.  The Set Aside Proceeding in Sweden ............................................................. 11

    E.  The EU Legal Order ......................................................................................... 12

    F.  The Genesis of the Intra EU Objection .......................................................... 13

        1.  The *Achmea* Decision .............................................................................. 14

        2.  Post-*Achmea* Decisions Concerning Multilateral Treaties ..................... 16

        3.  The European Commission Seeks to Use the *Achmea* Decision to Ban Intra-EU Arbitration ................................................................................ 16

        4.  The *Komstroy* Decision ........................................................................... 17

        5.  The European Commission's and EU Member States' Actions Post-*Komstroy* ................................................................................................ 18

    G.  Non-EU Courts' Non-Receptivity to the Intra-EU Objection ........................ 19

III.  Argument ................................................................................................................ 21

    A.  This Court Has Subject Matter Jurisdiction ................................................... 21

        1.  This Court Has Subject Matter Jurisdiction Under 28 U.S.C. § 1605(a)(6), the "Arbitration Exception" ..................................................................... 21

        2.  This Court Has Subject Matter Jurisdiction Under 28 U.S.C. § 1605(a)(1) ................................................................................................................ 22

    B.  Poland Fails to Meet its Burden in Demonstrating that the Award Should Not Be Recognized Under Article V of the New York Convention ................................. 23

        1.  This Court's Discretion to Recognize the Award ...................................... 24

        2.  The Court Should Recognize the Award ................................................... 26

        3.  Poland Agreed to Arbitrate Under Applicable Law (Article V(1)(a)) ...... 35

        4.  The Award Does Not Violate U.S. Public Policy (Article V(2)(b)) ......... 42

    C.  Poland's *Forum Non Conveniens* Argument Must be Rejected ......................... 44

    D.  Poland's Request for Attorney's Fees Borders on the Frivolous ......................... 44

IV.  Conclusion .............................................................................................................. 45

## TABLE OF AUTHORITIES

**Page(s)**

**U.S. Cases**

*Ackermann v. Levine*,
    788 F.2d 830 (2d Cir. 1986)......................................................................35

*Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*,
    663 F. Supp. 3d 11 (D.D.C. 2023)..............................................................23

*Balkan Energy Ltd. v. Repub. Of Ghana*,
    302 F. Supp. 3d 144 (D.D.C. 2018).............................................................40

*BCB Holdings v. Gov't of Belieze*,
    110 F. Supp. 3d 233 (D.D.C. 2015).............................................................43

*Belize Bank Ltd. v. Gov't of Belize*,
    191 F. Supp. 3d 26 (D.D.C. 2016), *aff'd*, 852 F.3d 1107 (D.C. Cir. 2017)............................24

*Blasket Renewable v. Spain*,
    665 F. Supp. 3d 1 (D.D.C. 2023)................................................................40

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)..................................................................................29

*Central Virginia Community College* v. *Katz*,
    546 U.S. 356 (2006)..................................................................................18

*Chevron Corp. v. Repub. of Ecuador*,
    949 F. Supp. 2d 57 (D.D.C. 2013)..............................................................44

*Chevron v. Repub. of Ecuador*,
    795 F.3d 200 (D.C. Cir. 205).........................................................22, 37, 43

*Compañía De Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua*
    *S.A.B. de C.V.*,
    58 F.4th 429 (10th Cir. 2023) ...............................................................27, 28

*Corporacion Mexicana De Mantenimiento Integral, S.* de *R.L.* de *C.V. v. Pemex-*
    *Exploracion y Produccion*,
    832 F.3d 92 (2d Cir. 2016).................................................................. *passim*

*Corporación Mexicana de Mantenimiento Integral v. Pemex-Exploración y*
    *Producción*,
    962 F. Supp. 2d 642 (S.D.N.Y. 2013).....................................................30, 33

*Creighton Ltd. v. Gov't of State of Qatar*,
    181 F.3d 118 (D.C. Cir. 1999) ..................................................................23

*Getma Int'l v. Republic of Guinea*,
    862 F.3d 45 (D.C. Cir. 2017) ...................................................................27

*GTE Sylvania, Inc. v. Consumers Union*,
    445 U.S. 375 (1980) ..................................................................................45

*Henry Schein Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019) ....................................................................................37

*King v. Allied Vision*,
    65 F.3d 1051 (2d Cir. 1995) ...............................................................44, 45

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ..................................................................................29

*LLC SPC Stileks v. Repub. of Moldova*,
    985 F.3d 871 (D.C. Cir. 2020) .......................................................22, 37, 44

*Micula v. Gov't of Rom.*,
    No. 15 Misc. 107, 2015 WL 4643180 (S.D.N.Y. Aug. 5, 2015) (*rev'd on other
    grounds*, 714 F. App'x 18 (2d Cir. 2017) (summary order)) ....................42

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
    473 U.S. 614 (1985) ..................................................................................24

*Nextera Energy Glob. Holdings B.V*,
    656 F. Supp. 3d 201 (D.D.C 2023) ...........................................................42

*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
    112 F.4th 1088 (D.C Cir. 2024) ........................................................ *passim*

*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du
    Papier (RAKTA)*,
    508 F.2d 969 (2d Cir. 1974) .....................................................................43

*Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*,
    27 F.4th 771 (D.C. Cir. 2022) ...................................................................23

*Stati v. Repub. of Kazakhstan*,
    199 F. Supp. 3d 179 (D.D.C. 2016) .....................................................22, 23

*Tahan v. Hodgson*,
    662 F.2d 862 (D.C. Cir. 1981) ..................................................................29

*Tatneft v. Ukraine*,
  301 F. Supp. 3d 175 (D.D.C. 2018), *aff'd* 771 F. App'x 9 (D.C. Cir. 2019),
  *cert. denied Ukraine v. Tatneft*, 140 S. Ct. 901 (2020)..........................................................23

*TermoRio S.A., E.S.P. v. Electranta S.P.*,
  487 F.3d 928 (D.C. Cir. 2007).....................................................................................27, 29, 35

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
  411 F.3d 296 (D.C. Cir. 2005)...........................................................................................44

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996)..........................................................................................................33

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*,
  126 F.3d 15 (2d Cir. 1997)............................................................................................26, 45

*Zuver v. Sprigg*,
  2018 WL 3617308 (D.D.C. June 13, 2018)......................................................................40

**Foreign Cases**

*Commission v. United Kingdom*,
  Case C-516/22 (2024)........................................................................................................19

*Infrastructure Services Luxembourg et al. v. Spain*,
  ICSID Case No. ARB/13/31.............................................................................................20

*Opinion of Advocate General Wathelet*,
  Case C-284/16, ECLI:EU:C:2017:699 .............................................................................31

*Republic of Moldova v. Komstroy LLC*,
  Case C-741/19 (Sept. 2, 2021)................................................................................ *passim*

*RREEF Infrastructure (G.P.) Ltd. et al. v. Kingdom of Poland*,
  Case No. ARB/13/30, Decision on Jurisdiction, June 6, 2016 ................................39

*Slowakische Republik (Slovak Republic) v. Achmea BV*,
  Case C-284/16 (Mar. 6, 2018) ............................................................................... *passim*

*Yukos Capital SARL v. OJSC Rosneft Oil Co.*
  EWHC 2188 (Comm) [2014].............................................................................................28

**U.S. Statutes**

9 U.S.C. §§ 201 *et seq*..................................................................................................................1

28 U.S.C. § 1605......................................................................................................21, 22, 40

Federal Arbitration Act ...........................................................................................................1, 25

**Other Authorities**

Fed. R. Civ. P. 60(b)(5).................................................................................................27

Restatement (Fourth) of Foreign Relations Law § 442 (2018)........................................43

Swedish Arbitration Act .............................................................................................11, 37

Petitioner Mercuria Energy Group Limited ("**Mercuria**"), by and through its undersigned counsel, respectfully submits this opposition to the motion by the Republic of Poland ("**Poland**") to dismiss or stay the Petition ("**Motion**") (ECF 28).  Mercuria seeks recognition of an arbitral award ("**Award**") issued against Poland following an arbitration conducted under the Stockholm Chamber of Commerce ("**SCC**") Rules ("**Second ECT Arbitration**" or "**Arbitration**").  The Court should deny the Motion and grant the Petition, for the reasons that follow.

## I.    PRELIMINARY STATEMENT

Poland's motion to dismiss, reduced to its essentials, relies upon a single contention:  that the Award "no longer exists" as a result of a ruling ("**Set Aside Order**") by the Svea Court of Appeals ("**Svea Court**") annulling it.  According to Poland, this Court must dismiss this proceeding as a result of, and in deference to, that Swedish court ruling.

Indeed, Poland invites the Court to treat this matter almost as though it were a remand with instructions from the Svea Court, and to find that this Award should not be recognized because European Union ("**EU**") law forbids it.  But that is not how the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 6, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("**New York Convention**"), 9 U.S.C. §§ 201 *et seq*, works.  This Court—sitting as a court of secondary jurisdiction under the New York Convention and Chapter 2 of the Federal Arbitration Act—has discretion to recognize the Award.  In exercising that discretion, this Court must take into account **U.S.** law and public policy, both of which strongly disfavor the result that Poland urges here, since dismissal of Mercuria's petition would create a landscape where Poland's (and the EU's) recent decision to fundamentally change their view about the availability of arbitration under the Energy Charter Treaty ("**ECT**") would unfairly and retroactively deprive Mercuria of an arbitral remedy it was entitled to rely upon at the time it was invoked, and would leave Mercuria with no prospect of recovering tens of millions of dollars that the Polish

government has been ordered by its own courts—but has nonetheless refused—to pay. If Poland, its sister EU states, or the European Union wish to abandon the ECT, that is their sovereign prerogative—many EU Member States have, in fact, done precisely that. But what Poland may **not** do is unilaterally disclaim its obligations under that treaty toward an investor like Mercuria, which reasonably relied upon Poland's signature on the ECT at the time of investment and when it commenced two arbitrations against Poland pursuant to the "unconditional consent" to arbitrate expressly given by Poland under Article 26 of the ECT.

Poland also seeks to imbue this case with equity by suggesting Mercuria ran impetuously through a series of red lights to commence this arbitration, and suggests, implicitly if not expressly, that the Svea Court's rulings provide Mercuria its just desserts. That, too, is overly facile and ultimately wrong. The Court's review of this motion requires that it keep sight of the following facts, all of which fatally undermine both the truthfulness and equity of Poland's motion, which rests on a foundational assertion that the ECT "never" envisioned or allowed arbitration between EU-based investors and EU Member States (for ease of reference, such arbitrations will hereafter be referred to as "**intra-EU arbitrations**"):

- Mercuria's dispute with Poland dates back to Poland's first imposition of a pecuniary penalty on JSE in 2007 (*see infra* § II(B)), long before Case C-284/16, *Slowakische Republik (Slovak Republic) v. Achmea BV*, (Mar. 6, 2018) ("**Achmea**") or Case C-741/19, *Republic of Moldova v. Komstroy LLC*, (Sept. 2, 2021) ("**Komstroy**") were decided, and at a time when there had never been any significant suggestion that intra-EU treaty arbitration was improper or invalid under the ECT. Had such a suggestion been made, it would have had to ignore the fact that the EU itself—described by Poland as the keeper

of the EU's foundational treaties[1]—was a signatory to the ECT, had become a signatory despite trying, unsuccessfully, to carve intra-EU arbitrations out of the ECT's dispute resolution provisions, and despite the ECT's containing an express conflict of laws provision providing that its dispute resolution clause prevailed over any inconsistent treaty (such as the EU treaties it now says prohibit intra-EU arbitration).

- In the first arbitration between these parties ("**First ECT Arbitration**"), commenced in 2008, Poland raised a variety of jurisdictional defenses, but never suggested that Mercuria's status as an EU-based investor precluded the formation of an agreement to arbitrate.  Poland, which successfully defended Mercuria's damages claim in that arbitration, accepted Mercuria's payment of the costs award issued in Poland's favor, never suggesting that the arbitration was "invalid."

- The ruling of the Court of Justice of the European Union ("**CJEU**") in *Achmea* did not address arbitration under the ECT or, in fact, any multilateral treaty.  It concerned a **bilateral** investment treaty between two EU Member States, and the CJEU in *Achmea* specifically distinguished the treaty before it from multilateral treaties, like the ECT, to which the EU is itself a signatory.

- In the wake of *Achmea*, the EU Member States issued differing political statements concerning the impact of *Achmea* on intra-EU arbitration under the ECT.  While clearly not a binding or authoritative statement of law, what is most notable is that Sweden—the seat of arbitration in this case—took the position that *Achmea* **did not** impact the validity of intra-EU arbitration under the ECT.

Nothing in these events should or could have led Mercuria to conclude, when it commenced its

---

[1]    *See generally* Memorandum of Law in Support of the Republic of Poland's Motion to Dismiss and Opposition to the Petition (ECF 28-1) ("**Mem.**"), at 6-8.

second ECT arbitration against Poland, that the very same "unconditional consent" to arbitrate under Article 26 of the ECT upon which Mercuria relied in the First ECT Arbitration would be deemed "inapplicable" to Mercuria the second time around. To the contrary, Mercuria's reliance on the ECT's dispute resolution clause was proper and reasonable given the events that led to it, as well as the plain text of the ECT itself.

What happened **after** Mercuria commenced its arbitration against Poland—and after Mercuria had invested nearly three years and significant resources in that arbitration—is another matter entirely, and what has led the parties to this juncture. By 2019, EU Member States were already facing billions of dollars in potential liability stemming from a multitude of arbitration proceedings, primarily from energy investors.[2] Arbitral tribunals up to this time had unanimously rejected the arguments of EU Member States that *Achmea* had retroactively invalidated their agreements to arbitrate under the ECT, and those states continued to lose their arbitrations. European state liabilities mounted. European states, joined by the European Commission ("**EC**"), continued to issue proclamations and insist that the ECT did not permit intra-EU arbitration, while arbitrators—and some foreign courts—insisted that it did.[3] Then in 2021, the CJEU issued its decision in *Komstroy*, a case involving an arbitration that **did not involve any parties from the EU**. Despite that fact, the CJEU announced, apropos of nothing in the case before it, that EU law did not permit intra-EU arbitration, and that as a consequence, any agreement to arbitrate between an EU-based investor and an EU Member State was void *ab initio*.

For purposes of this case, everything else that happened subsequently in Europe became a *fait accompli*. While Poland hails the Svea Court's decision annulling Mercuria's award as a

---

[2]    Declaration of Erin Collins, Mar. 10, 2025 ("**Collins Decl.**"), Ex. A, Energy Charter Treaty, Statistics, (Dec. 1, 2023) (showing that the commencement of ECT cases peaked in 2015, with five times the average number of ECT claims that had been filed in the previous ten years).

[3]    *See generally* Declaration of Andrea Bjorklund, Aug. 5, 2024 (ECF 16) ("**Bjorklund**") ¶¶ 144-153.

paradigm of due process and fairness, the Court's decision was virtually pre-ordained, a conclusion that is underscored by the fact that the EC—the federal administrative body of the EU—had already chided and threatened Sweden with sanctions for its lack of fervor in opposing intra-EU arbitration.  The predictability of the Svea Court's decision does not, however, detract from its extraordinarily inequitable effect, which was to retroactively nullify an agreement to arbitrate contained within a treaty that Poland signed more than 30 years ago, and which had already produced two arbitral awards between the parties.  While the Set Aside Order (ECF 28-3) declared Poland's agreement to arbitrate under Article 26 of the ECT "incompatible with the fundamental rules and principles governing the legal system in the EU," it failed to acknowledge the obvious fact that this incompatibility was entirely the result of Poland's own making by signing and remaining party to a multilateral treaty that it now alleges it was incapable of complying with under EU law.  Despite this, the Set Aside Order effectively shifts responsibility for the consequences of Poland's violation to the innocent party—the investor, Mercuria—which had every reason to rely on Poland's signature when it invested in Poland in 2004, when it invoked Article 26 of the ECT to commence the First ECT Arbitration against Poland in 2008, and when it relied again on Poland's capacity to arbitrate with Mercuria under Article 26 of the ECT (which Poland did not dispute in the First ECT Arbitration) in the Second ECT Arbitration.

The die has been cast in Europe, and the fact is, the institutions of the EU have done all they can to ensure Mercuria will not recover its award through judicial proceedings anywhere in Europe.  But this case was brought in the United States, and it is governed by U.S. law and policy as well as a treaty that affords this Court discretion to recognize the award notwithstanding the vagaries of EU law, and despite its having been annulled in Sweden.  Poland notes—correctly—that under the law of this Circuit, a party seeking recognition of an annulled award must show

extraordinary circumstances, and specifically that the circumstances surrounding the annulment are "repugnant to fundamental notions of what is decent and just" in the United States. But this is such a case. It a virtual re-run of *Corporacion Mexicana De Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploracion y Produccion*, 832 F.3d 92, 106 (2d Cir. 2016) ("**Pemex**"), a case where the foreign investor had won in arbitration, only to have institutions of the country where the arbitration took place (and where the award debtor was domiciled) change the law after the fact to ensure that the award could not be enforced. As in *Pemex*, the Svea Court's annulment of this Award was predicated on a change of law that was applied retroactively, and as in *Pemex*, the Svea Court's annulment would leave Mercuria—which has been contesting this matter for nearly 17 years—without a remedy, while letting the award debtor off scot-free. To defer to the Set Aside Order, or the EU courts' recent decisions purporting to retroactively invalidate EU Member States' longstanding agreements to arbitrate with investors of all ECT Contracting States, would be so grossly inequitable in this circumstance as to violate "fundamental notions of what is decent and just." The Court should refuse to do so, and should recognize the Award.

## II.    BACKGROUND

### A.    THE ENERGY CHARTER TREATY

The ECT is a multilateral investment treaty with Contracting Parties from around the globe, including European states like Cyprus and several outside of the EU including Afghanistan, Japan, Jordan, Switzerland and Turkey.[4] Adopted in 1998, the ECT promotes cross-border cooperation in the energy industry. Like most investor protection treaties, the ECT applies **international**—not domestic—law in requiring Contracting Parties to "accord . . . fair and equitable treatment" to the investments of other Contracting Parties' investors. ECT, art. 10(1).

---

[4]    The European Union (effective June 2025) and several EU Member States including, France (2023), Germany (2023), Italy (2016), the Netherlands (effective June 2025), Poland (2023), Luxembourg (2024), Slovenia (2024), Portugal (2025) and the United Kingdom (effective April 2025) have withdrawn from the ECT.

In addition to its substantive protections, the ECT, like most investment treaties, also protects investors by allowing them to bring disputes before a neutral international arbitral forum, (rather than to the host state's own courts), a right that is "one of the principal advantages of investment treaties." Declaration of Andrea Bjorklund, August 5, 2024 (ECF 16) ("**Bjorklund**"), ¶ 34. Article 26(3)(a) of the ECT provides that "**each** Contracting Party hereby gives its **unconditional consent** to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article." ECT, art. 26(3)(a) (emphasis added). The ECT contains no language precluding investors from certain Contracting Parties from commencing arbitration against any other Contracting Party, and expressly states that "[n]o reservations may be made." ECT, art. 46. Almost as if predicting this precise situation, the drafters of the ECT included a clear conflict of laws provision, Article 16, which states:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty; . . . **(2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty; where any such provision is more favourable to the Investor or Investment.**

ECT, art. 16(2) (emphasis added). Put simply, Article 16 provides that, should the dispute resolution provisions of the ECT conflict with another treaty—such as the EU treaties—the ECT's dispute resolution provisions take precedence. The ECT contains no exceptions or carve outs, commonly called "disconnection clauses," that would preclude intra-EU arbitration. *See* Bjorklund, ¶ 5. That was not accidental: the drafting history of the ECT shows that the EU proposed a disconnection clause with respect to the EU treaties that would have precluded intra-EU arbitration, but that proposal was rejected. *Id.* ¶ 64. The EU nonetheless signed the ECT.

In November 2017, ECT Contracting Parties embarked on an attempt to "modernize" the ECT. *See* Bjorklund ¶ 96. This effort to amend the ECT revived the EU's previous proposal to

add a disconnection clause to the treaty so that **future intra-EU arbitrations** would be excluded. These efforts have not yielded a new ECT, and in the interim, the EU and several Member States decided to withdraw from the ECT entirely.

### B.    MERCURIA'S INVESTMENTS IN, AND DISPUTES WITH, POLAND

The dispute in the underlying arbitration concerns Poland's treatment of JSE. JSE was incorporated in 1995, and in 2004, ownership of JSE was transferred to Mercuria. Award (ECF 1-5), ¶ 174. After Poland joined the EU, the Polish government issued regulations requiring entities like JSE to create and maintain a mandatory stock of liquid fuels. *See id.* ¶ 176. In October 2007, the Polish Material Reserves Agency ("**MRA**") imposed a pecuniary penalty on JSE for an alleged breach of these regulations ("**First Penalty**"). *Id.* The First Penalty was reversed; however, the MRA imposed a second penalty on April 3, 2008 ("**Second Penalty**"), which JSE also appealed. *Id.* ¶¶ 177-79. Mercuria loaned funds to JSE, which was under threat of becoming bankrupt as a result of the MRA's enforcement of the Second Penalty, so that JSE would have sufficient capital to pay the Second Penalty. *Id.* ¶ 182. In July 2008, JSE paid the Second Penalty and the accrued interest at a rate of 15% per annum. *Id.* ¶¶ 184-86.

On December 23, 2008, after the First ECT Arbitration was commenced, the Provincial Administrative Court in Warsaw issued a judgment repealing the Second Penalty, including the interest triggered by the late penalty payment. *Id.* ¶ 188. The Supreme Administrative Court of Poland ("**SAC**") upheld this judgment on October 20, 2009. *Id.* ¶ 189. On February 26, 2010, the MRA discontinued administrative proceedings against JSE. *Id.* ¶ 189.

On October 22, 2009, JSE sought repayment of the Second Penalty from the MRA, but the MRA returned only the principal amount, refusing to return the substantial amount of interest JSE had paid, and the interest continuing to accrue on that amount (totaling more than US$18 million). *Id.* ¶¶ 190-91. JSE initiated three different civil proceedings in the Polish courts to

obtain repayment. *See id.* § VI. From 2010 to 2022, the Administrative Courts of Poland rendered six judgments against the MRA, *id.* ¶ 211, but the MRA failed to comply with any of them. *See id.* ¶¶ 240-42. The MRA continues to refuse to comply with the Polish judgments issued in JSE's favor, and JSE's dispute with the MRA remains ongoing.

### C.    THE ECT ARBITRATIONS

The Polish government's refusal to follow the orders of its own courts and compensate JSE for the improper penalties it imposed resulted in two ECT arbitrations, described below.

### 1.    The First ECT Arbitration

Mercuria initiated the First ECT Arbitration on July 24, 2008 as a result of Poland's refusal to grant JSE an exemption from new liquid fuel regulations and its decision to impose the First and Second Penalties on JSE. Mercuria argued that Poland's measures in this regard breached its ECT obligations regarding fair and equitable treatment, unreasonableness, non-discrimination, and constant protection and security. Kołkowski, Ex. B (ECF 14-2), ¶ 151.

Poland asserted three jurisdictional objections: that Mercuria (1) had not made a qualifying investment in Poland; (2) waived its right to arbitrate under the ECT by litigating before the Polish courts; and (3) failed to establish a *prima facie* case because the finality of the penalties imposed remained uncertain (at this point, appellate judicial proceedings were still pending). Kołkowski, Ex. A (ECF 14-1), §§ II-IV. Poland **did not** assert that its offer to arbitrate in Article 26(3) of the ECT was inapplicable to investors from other EU Member States. Nor did Poland argue that its accession to the EU in 2004 vitiated its unconditional offer to arbitrate.

On December 22, 2014, the Tribunal dismissed Mercuria's damages claim. It ordered Mercuria to pay a portion of Poland's arbitration fees and costs, which Mercuria did. Declaration of Jarosław Kołkowski, Aug. 5, 2024 (ECF 14), ¶ 6.

### 2.    The Second ECT Arbitration

9

As a result of the MRA's continued refusal to comply with the Polish court orders directing the MRA to settle JSE's demand for the return of its Second Penalty-related payments in full, including the interest paid and accruing, on September 12, 2019, Mercuria initiated the arbitration leading to this Award (the "**Second ECT Arbitration**").  Award (ECF 1-5), ¶ 14. Mercuria's ECT claims again concerned Poland's treatment of JSE, but this time were based on the Polish administrative regime's failure to provide an effective means to obtain repayment of amounts due to JSE despite more than ten years of Polish litigation.  *See id.* ¶ 884.

In the Arbitration, Poland alleged for the first time that its consent to arbitrate with investors from other EU Member States, like Mercuria, became invalid **in 2004** when it joined the EU.  *Id.* ¶ 257.  Poland based this argument on the CJEU's decision in *Achmea,* and later, once it was issued, *Komstroy*,[5] along with the EU treaties.  The Tribunal rejected these arguments. The Tribunal first noted the parties did not dispute "the Tribunal's power to determine its own jurisdiction."  *Id.*, ¶ 252.[6]  It then found that the plain language of ECT Article 26(6) provided that the applicable law to the dispute was international law, not EU law.  *Id.* ¶ 355.  The Tribunal recognized that as a Stockholm-seated arbitration,[7] it should give due consideration to the law of the arbitral seat—here, Swedish law—in determining its own jurisdiction.  *Id.* ¶ 359.  It found,

---

[5]    *Komstroy* was issued in September 2021, **after** the Arbitration had been commenced, and after the hearing on the merits had concluded, but before the Tribunal had rendered an award.  The Tribunal granted the parties leave to file submissions on the impact of the *Komstroy* decision in the case and considered those arguments before issuing the Award.  Award, ¶¶ 99-101.

[6]    Poland does not contest this finding, which is clear and unmistakable evidence the parties intended questions of arbitrability to be decided by the Tribunal.

[7]    Article 26(4) of the ECT offers the Investor three options for arbitration: (1) under the auspices and rules of the International Centre for Settlement of Investment Disputes ("**ICSID**"), (2) under the auspices and rules of the Stockholm Chamber of Commerce; or (3) *ad hoc* (without institutional affiliation or supervision) arbitration under the UNCITRAL Rules.  Poland is not a party to the ICSID Convention, therefore removing ICSID arbitration as an option to Mercuria.  As Poland acknowledged, the SCC Rules set Stockholm as the default arbitral seat if the parties are unable to agree on another seat.  Mercuria sought Poland's agreement to an arbitral seat outside the EU – specifically, in Switzerland – Poland refused.  Kołkowski ¶ 7.  Thus, the parties proceeded with the Arbitration in Stockholm.  Mercuria's non-arbitration option—to litigate in Polish courts pursuant to Article 26(2)(a) of the ECT—was not a viable option because Mercuria's claim arose from its inability to obtain the relief granted to Mercuria by Polish court orders.

however, that Swedish law dictated the same outcome:  because this case concerned an international dispute, and the parties' "agreement" (here, the ECT) contained an applicable law clause (ECT Article 26(6)), Section 48 of the Swedish Arbitration Act required that the Arbitration "be governed by the law agreed upon by the parties"—*i.e.*, international law.  *Id.* ¶ 360.  Applying international law, the Tribunal considered Poland's arguments concerning, *inter alia*, the 2019 EU Member State declarations (*id.* ¶¶ 406-11) and the CJEU judgments in *Achmea* and *Komstroy* (*id.* ¶¶ 437-60) and found that none supported a finding that the Tribunal should ignore from the plain language of the ECT and conclude that intra-EU arbitration was precluded. *Id.* ¶ 463.  The Tribunal reasoned that it was "neither bound by [the judgments of the CJEU] nor considers them applicable to the arbitration established under and in accordance with a valid international law instrument, namely the ECT," *id.* ¶ 460, and accordingly found that a valid arbitration agreement existed and that it had jurisdiction.

On the merits, the Tribunal found that Mercuria "did everything that could be reasonably expected of them in order to have the administrative authorities [of Poland] resolve JSE's application in an effective manner and within reasonable time" and that Poland had failed to "afford[] [Mercuria] effective local remedies to enforce its rights in the case at hand" and thus breached Poland's obligations under Articles 10(12) and 10(1) of the ECT.  *Id.* ¶¶ 811, 816, 838. The Tribunal rendered an award in Mercuria's favor in the amount of more than PLN 209 million (about US$ 53.6 million[8]) plus post-award interest, legal fees, and costs.  *Id.* ¶ 930.

### D.    THE SET ASIDE PROCEEDING IN SWEDEN

Poland filed an application before the Svea Court in Sweden seeking to vacate the Award, and requested, and received, an order suspending the Award's enforcement on an *ex parte* basis

---

[8]    Based on the current exchange rate of PLN 4.90 to US$ 1.

("**Inhibition Order**").    Declaration of Jakob Ragnwaldh, August 5, 2024 (ECF 15) ("**Ragnwaldh**"), ¶ 5-6.  But at no point following the Inhibition Order did the Svea Court find Mercuria's decision to initiate this litigation to be a violation of its Order, nor did Poland seek any such finding from the Svea Court.  *See* Ragnwaldh ¶ 11.

On December 23, 2024 the Svea Court issued its Set Aside Order declaring the Award invalid under Swedish and EU law.  ECF 28-3.  In reaching its decision, the Svea Court did not analyze the unique facts of Mercuria's case, but focused on the CJEU's recent pronouncements of EU law.  The Svea Court reasoned that "the CJEU ruled that Article 26(2)(c) of the [ECT] must be interpreted as not applying to disputes between a Member State and an investor from another Member State," *id.* at 12, and that "the CJEU clarified that the question of whether an arbitral body's jurisdiction is valid in the case at bench cannot depend on the conduct of the parties to the dispute" because "arbitration clauses based on international investment protection agreements between Member States are contrary to some of the most fundamental principles of EU law." *Id.* at 13.  Based on this understanding, it held that "an arbitral award between a Member State and an investor from another member state, which has been issued on the basis of an arbitration clause in an international investment agreement," was necessarily "incompatible with the fundamental rules and principles governing the legal system in the EU and thus also in Sweden." *Id.* at 13.  It then declared the award invalid because "[u]pholding the arbitral award would be manifestly incompatible with the bases for the Swedish legal system." *Id.*

### E.    THE EU LEGAL ORDER

The European Union is an organization created by a series of treaties—principally the Treaty on the European Union ("**TEU**") and the Treaty on the Functioning of the European Union ("**TFEU**").  While the EU itself was formed by treaties, that does not transform the law governing

the EU (*i.e.*, EU law) into "international law."[9]  EU law is community-based, regional law that applies within the EU only.  Declaration of Sir Alan Dashwood KC, Aug. 5, 2024 (ECF 17) ("**Dashwood**"), ¶¶ 14-16.  Public international law, on the other hand, is the law of nations, an order distinct from that of individual States or regional communities.  *Id.* ¶ 156.

The CJEU has held, in a limited number of cases, that the provisions of a particular international agreement violated EU constitutional norms.  Dashwood, ¶¶ 23-24.  In such cases, the EU (or the relevant Member State) must then take affirmative acts to bring itself into compliance with EU law by withdrawing from the offending treaty.  *Id.* ¶ 24; Bjorklund ¶ 91.  What it cannot do is what Poland has attempted to do here, which is simply to denounce its obligations under the treaty in question or declare them to be "null and void" with immediate effect.  Bjorklund ¶¶ 91, 139; *see also* Dashwood ¶ 150 (incompatibility with EU law does not render EU Member States' obligations "null and void").  Consistent with these principles, if a state joins the EU and was a party to an agreement that conflicts with EU law, that state's prior treaty obligations do not disappear upon entry.  Bjorklund, ¶ 139; Dashwood, ¶ 139.  Rather, the new EU Member State has an obligation to renegotiate or terminate the agreement which conflicts with EU law.  Dashwood, ¶ 23.

### F.   THE GENESIS OF THE INTRA EU OBJECTION

Poland's principal objection to recognition of the Award is that EU law precludes EU investors from arbitrating disputes with EU Member States.  But EU Member States have long participated in intra-EU arbitration.  As noted herein, Poland itself did not raise the intra-EU

---

[9]   An analogy to American constitutional law is useful here.  The U.S. Constitution was ratified by the several States, each of which was a sovereign entity at the time they ratified the Constitution.  Viewed through that lens, the Constitution was the product of a compact entered into by the ratifying States and the States that later acceded to it, but that does not transform the U.S. Constitution into "international law."  As Professor Dashwood explains, "the fact that the EEC Treaty was an international agreement is referred purely as a matter of "form"; the real significance to be given to the treaty was that of a constitutional instrument."  Dashwood, ¶ 155.

objection in the First ECT Arbitration, and, at the time the Arbitration was initiated, Sweden itself did not consider intra-EU arbitration under the ECT to be prohibited. Bjorklund, ¶ 82. While Poland would have this Court believe that its current position is one of long standing that has always been understood, Mem. at 13-14, the record demonstrates the intra-EU objection is a come-lately contrivance by the EU and its Member States to avoid the massive liabilities that have cascaded down as a result of those Member States' multiple and repeated violations of the ECT's investor protections. By the time the CJEU issued its decision in *Komstroy*, these liabilities totaled more than **EUR 1.2 billion** in ECT awards and nearly **EUR 2 billion in pending ECT claims**.[10] Whatever the reasons for Poland's position, the intra-EU objection and the CJEU's recent decisions purporting to legitimize it, simply have no relevance before this Court.

### 1.    The *Achmea* Decision

In *Achmea*, Slovakia asked a German court to set aside an arbitration award that had been rendered against it in favor of an EU investor. Slovakia argued that the tribunal lacked jurisdiction to hear the dispute because the arbitration clause in the Netherlands-Slovakia BIT was incompatible with EU law. *Achmea* ¶ 11. The Higher Regional Court of Frankfurt rejected these arguments. On appeal, the German Federal Court of Justice referred several questions to the CJEU, including whether the BIT's arbitration remedy comported with EU law. *Id.* ¶ 14.

The CJEU issued a preliminary ruling that the arbitration clause contained in the Netherlands-Slovakia BIT was not compatible with EU law. The ruling was based on the CJEU's finding that its jurisdiction to decide EU law issues would be impermissibly curtailed if an arbitral tribunal constituted under a BIT could make findings on issues of EU law, because only national courts of EU Member States may refer questions of EU law to the CJEU. *Id.* ¶¶ 58-60. The

---

[10]    Collins Decl., Ex. A, Energy Charter Treaty, Statistics, (Dec. 1, 2023).

CJEU's analysis focused on the BIT's choice of law clause, which required the tribunal to apply the domestic law of the Contracting Party concerned, and since EU law is part of EU Member States' domestic laws, EU law would apply to the case. *Id*. ¶¶ 39-42; Dashwood, ¶ 65. The CJEU concluded that because the BIT's arbitration mechanism did not provide a method to refer questions of EU law to the CJEU, it was incompatible with EU law because it could not ensure "the full effectiveness of EU law, even though they might concern the interpretation or application of that law." *Achmea* ¶¶ 53-56; *see also* Dashwood, ¶ 63.

The CJEU was not asked in *Achmea* to assess the compatibility of EU law with multilateral treaties like the ECT. Despite this, the CJEU distinguished the case before it from situations, like this one, where the treaty providing for arbitration was a multilateral treaty to which the EU itself was a party, and noted that it was "settled case-law of the Court" that the EU has the "capacity to conclude international agreements" and consent "to submit to the decisions of a court which is created or designated by such agreements." *Achmea*, ¶ 57; Bjorklund ¶ 50. *Achmea* thus expressly preserved the possibility that "the EU could sign a treaty and agree to refer matters regarding compliance with that treaty to independent dispute settlement." Bjorklund, ¶ 52. Even the Advocate General—an EU judicial officer responsible for analyzing the relevant law and arguments of the parties on behalf of the CJEU in each case brought before it— acknowledged a general understanding among EU Member States and their courts that intra-EU investment arbitration was entirely ordinary and proper, remarking that "if no EU institution and no Member State sought an opinion from the Court on the compatibility of that treaty with the EU and FEU Treaties, **that is because none of them had the slightest suspicion that it might be incompatible**."[11] Dashwood, Ex. 17, ¶ 43 (emphasis added).

---

[11] Advocate Generals are also tasked with delivering an independent opinion and recommending a decision for the

### 2.    Post-*Achmea* Decisions Concerning Multilateral Treaties

Immediately following *Achmea*, the CJEU continued to issue decisions suggesting that the multilateral treaties to which the EU was a Contracting Party, such as the ECT, would not be subject to the same logic applied in *Achmea*.  In an April 30, 2019 decision concerning an EU-Canada trade agreement, the CJEU clarified that multilateral investor-state dispute settlement mechanisms that bypass the CJEU do not "adversely affect[] the autonomy of the EU legal order," and held that such arrangements—particularly when contained in treaties to which the EU is a Contracting Party—are compatible with EU law.  *See Opinion Pursuant to Article 218(11) TFEU*, CJEU Case EU:C:2019:341 (Apr. 30, 2019), ¶¶ 106-19 ("**CETA Decision**"); Dashwood, ¶ 98. The CETA Decision thus gave investors like Mercuria strong reason to believe *Achmea* would be confined to its facts and should not be assumed to extend to multilateral treaties like the ECT.

### 3.    The European Commission Seeks to Use the *Achmea* Decision to Ban Intra-EU Arbitration

Despite the express limitations included in *Achmea*, and the CJEU's subsequent CETA Decision, the EC issued a non-binding "policy paper" in July 2018 setting forth its view that EU Member States should abandon the arbitration procedures in existing investment treaties.  The policy paper did not posit that EU law precluded intra-EU arbitrations, or say that such arbitrations were retroactively unlawful.  Nonetheless, EU Member States (along with the EC, appearing as *amicus curiae*) began arguing before courts and tribunals that intra-EU arbitration was incompatible with EU law, and on the basis of that newly-adopted view, refusing to comply with ECT awards rendered against them.

In January 2019, EU Member States issued non-binding "declarations" espousing their views of the "legal consequences" of *Achmea*—though, critically, not all EU Member States were

---

CJEU.  These opinions are the starting point for CJEU recommendations, have judicial authority, and are regularly cited in subsequent cases.  Dashwood, ¶ 43, n.37.

in agreement on what those "consequences" were. Bjorklund, ¶ 82-85. While all EU Member States agreed that investor-state arbitration clauses contained in **bilateral** investment treaties concluded between EU Member States were incompatible with EU law, they did **not** all agree that *Achmea* invalidated the ECT's arbitration clause. Notably, Sweden (where Mercuria agreed to arbitrate) was one of six EU Member States that took the position that *Achmea* did **not** impact the ECT's dispute resolution clause. *See id.* ¶ 83. Hungary went even further, refusing to state that *Achmea*'s holding extended to the ECT and further positing that *Achmea* could only be viewed as the law concerning BIT arbitration going forward, with no retroactive application. *Id.* Thus, not even all EU Member States, let alone all ECT Contracting Parties, were unanimous in their views concerning *Achmea*'s effect on ECT arbitration.

Throughout this time, at least 34 ECT tribunals unanimously rejected the argument that EU law could prohibit intra-EU arbitration under the ECT. Bjorklund, ¶ 145, n.105.

### 4. The *Komstroy* Decision

On September 2, 2021—two years after Mercuria commenced the Second ECT Arbitration and near the conclusion of that proceeding—the CJEU decided *Komstroy*, which involved an *ad hoc* arbitration under the ECT between a Ukrainian company and Moldova – not an intra-EU dispute, as neither Ukraine nor Moldova are EU Member States. The Paris Court of Appeal requested a preliminary ruling from the CJEU on whether a contract for the sale of electricity was an "investment" under the ECT. Despite the fact that the question was neither referred by the Paris Court of Appeal nor necessary to decide the case, the CJEU remarked that "despite the multilateral nature of the international agreement [of] which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the case giving rise to the judgment of [*Achmea*], paragraph 58)." *Komstroy*, ¶ 64. The CJEU

asserted: "preservation of the autonomy and of the particular nature of EU law precludes the same [arbitration] obligations under the ECT from being imposed on Member States as between themselves." *Id.* ¶ 65. These findings were *obiter dictum*, which under EU law, is generally not viewed as binding or precedential.[12] Dashwood, ¶ 12(c). *Komstroy* did not expressly rule on whether the principle embodied within the relevant dicta in that case should be applied retroactively to invalidate past and current ECT arbitrations and awards. Dashwood, § V(A).

### 5. The European Commission's and EU Member States' Actions Post-*Komstroy*

After *Komstroy*, the EU engaged in various efforts to amend the ECT, including by seeking to add a disconnection clause that would carve out intra-EU disputes from the dispute resolution mechanism provided by Article 26. Bjorklund, ¶ 104. On December 28, 2022, Poland formally withdrew from the ECT (with effect on December 29, 2023),[13] and on May 30, 2024, the EU announced its withdrawal from the ECT (with effect on June 28, 2025).[14] *Id.* ¶ 41.

Following the EU's withdrawal, on June 25, 2024, twenty-six EU Member States signed an *inter se* declaration, purporting to give retroactive effect to *Komstroy* vis-à-vis investments made before the issuance of that decision. *Id.* ¶ 86. The declaration posited that, pursuant to *Komstroy*, an EU Member State's offer to arbitrate in the ECT "cannot extend, **and could not have been extended**" to intra-EU arbitration disputes. *Id.* n.66 (emphasis added). Still, EU Member States were not unanimous in this view. Hungary issued its own declaration which refused to give retroactive effect to *Komstroy*. *Id.* n.67 ("Article 26(2)(c) . . . shall be interpreted

---

[12] The same principle applies under U.S. law. *See Central Virginia Community College* v. *Katz*, 546 U.S. 356, 363 (2006) (recalling that the Supreme Court is "not bound to follow its dicta").

[13] Collins Decl., Ex. B, Energy Charter Treaty, Written Notification of Withdrawal from ECT (Poland), Dec. 28, 2022. Poland was an ECT Contracting Party at the time of Mercuria's investment, and when Mercuria commenced the First and Second ECT arbitrations. The ECT also contains a "sunset" clause which preserves and extends Poland's obligations under the ECT for 20 years following its withdrawal. ECT, art. 47(3).

[14] Collins Decl., Ex. C, Energy Charter Treaty, Written Notification of Withdrawal from ECT (European Union), July 5, 2024.

and applied in such a way that it **shall no longer** serve as a legal basis" for intra-EU arbitration).

In parallel to these efforts to amend or withdraw from the ECT, the EC brought actions to compel EU Member States to comply with the EC's interpretation of *Achmea* and *Komstroy*. Sweden, in particular, was an object of the EC's ire:  on December 2, 2021, the EC announced it was threatening Sweden (along with other EU Member States) with "enforcement actions"[15] for their insufficient vigor in supporting the EC's efforts to terminate intra-EU investment arbitration. Collins Decl., Ex. E, EU Commission Infringement Decisions, Dec. 2, 2021, at 13–14.  The announcement declared that Sweden and the other targeted EU Member States had not acted promptly enough to "eliminate" intra-EU arbitration, and threatened lawsuits potentially leading to monetary sanctions should they fail to "promptly" eradicate it within their jurisdictions.  *Id*.

### G.    NON-EU COURTS' NON-RECEPTIVITY TO THE INTRA-EU OBJECTION

Several national courts outside the EU have rejected EU Member States' attempts to retroactively void their agreements to arbitrate under the ECT and have recognized arbitral awards issued in ECT disputes between EU investors and EU Member States.

Just last year, the Swiss Supreme Court issued a decision in *Spain v. A*, where the court held that Spain had validly agreed to arbitrate under Article 26 of the ECT.  Bjorklund, ¶ 147.  It found that **international law** governed the ECT, and that nothing in the EU treaties or any decision by the CJEU could be deemed to limit this standing offer only to investors from Contracting Parties that are not-EU Member States.  *Id*.  The court found that the attempts by EU Member States to use the CJEU decisions in *Achmea* and *Komstroy* to nullify their offers to arbitrate ECT disputes were evidence of a broader "'crusade' against intra-EU investment

---

[15]    The EC had already done this in respect of the United Kingdom by bringing enforcement proceedings against the country for enforcing an ICSID award between intra-EU parties.  In March 2024, the CJEU ruled in the EC's favor in Case C-516/22, *Commission v. United Kingdom*, finding that the United Kingdom had violated its obligations under EU law, which remained applicable in the United Kingdom under the relevant Brexit withdrawal agreement, and order the United Kingdom to pay costs.  *See* Collins Decl., Ex. D.

arbitration," and warned that if individual states (or a collection of states) were permitted to invalidate international commitments on the basis of the alleged "primacy" of their internal law, this would lead to inequitable results and a flood of claims by states seeking to use domestic law to avoid responsibility for their international commitments. *Id.*

Likewise, the UK High Court of Justice, in *Infrastructure Services Luxembourg et al. v. Spain*, rejected Spain's arguments, based on *Achmea* and *Komstroy*, that Spain's offer to arbitrate in the ECT did not extend to EU investors. Bjorklund, ¶ 149. The court found that there was "no justification for interpreting their effect as . . . creating . . . only a partial offer of arbitration to some investors, but not others." *Id.* ¶ 150. Courts in Australia and New Zealand have likewise enforced intra-EU ECT awards issued under the ICSID Convention, demonstrating that the intra-EU objection has gained little traction with enforcement courts outside of the EU. *Id.* ¶ 153.

The decisions of these non-EU courts are consistent with near-universally recognized principles of contract interpretation and supported by the chronology of relevant events. In summary, the EU initially sought to include a disconnection clause that would exclude intra-EU arbitration from the ECT, but that effort was rejected by the Contracting Parties. Bjorklund, ¶ 64. Before *Achmea*, there was no doubt that intra-EU arbitration was permissible—as evidenced by Poland's own conduct during the First ECT Arbitration, Kołkowski, Ex. A (ECF 14-1), §§ II-IV, and confirmed by the EU Advocate General, Dashwood, Ex. 17, ¶ 43. Moreover, even after *Achmea*, it appeared that there was no basis to apply *Achmea*'s reasoning to a multilateral treaty, much less a multilateral treaty like the ECT, to which the EU itself was party—as confirmed by the CJEU itself in considering CETA. CETA Decision, ¶¶ 106-19; Dashwood, ¶ 98. Despite that, the CJEU in *Komstroy* opined, on an issue not before it, that intra-EU arbitration under the ECT was not permissible. *Komstroy*, ¶ 65; Dashwood, ¶ 12(c). In short, the historical record of

this issue confirms that Poland's contention that the ECT must be understood as always having barred intra-EU arbitration is simply false; rather, the intra-EU objection is a novel, contrived interpretation to allow EU Member States to avoid liabilities that resulted from the breaches of their international obligations made for the benefit of individual energy investors.

## III.    ARGUMENT

### A.    THIS COURT HAS SUBJECT MATTER JURISDICTION

The Foreign Sovereign Immunities Act ("**FSIA**") governs U.S. courts' jurisdiction over foreign states and their instrumentalities.  The FSIA provides presumptive sovereign immunity to foreign states, but that presumption is subject to several exceptions.  *See* 28 U.S.C. § 1605.  Where a claim brought against a foreign state falls into one of these exceptions, U.S. courts have jurisdiction.  *Id*. § 1330(a).  Here, both the arbitration and waiver exceptions apply.

### 1.    This Court Has Subject Matter Jurisdiction Under 28 U.S.C. § 1605(a)(6), the "Arbitration Exception"

The D.C. Circuit's recent ruling in *NextEra* conclusively establishes this Court's subject matter jurisdiction under the FSIA's "arbitration exception," which permits a proceeding against a foreign state to "confirm an award" made pursuant to an agreement "by the foreign state," "with or for the benefit of a private party to submit to arbitration," if the "award is . . . governed by a treaty," including the New York Convention, that is "in force for the United States" and that "call[s] for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6); *see NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 at 1105 (D.C Cir. 2024) ("We hold . . . that the district courts have jurisdiction to enforce [these awards] under the FSIA's arbitration exception.").  The arbitration exception requires "three 'jurisdictional facts': (1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement."  *NextEra*, 112 F.4th at 1100.

Mercuria demonstrated these three jurisdictional facts by producing the ECT, the notice of arbitration, and the Award, the existence or authenticity of which Poland does not contest. *See NextEra*, 112 F.4th at 1101, 1103–1104; *Chevron v. Repub. of Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 205) (proffer of treaty containing arbitration provision, coupled with notice of arbitration, is prima facie evidence of arbitration agreement); *LLC SPC Stileks v. Repub. of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2020) (citing *Chevron*, 795 F.3d at 204); *Stati v. Repub. of Kazakhstan*, 199 F. Supp. 3d 179, 188 (D.D.C. 2016) (*citing Chevron*, 795 F.3d at 205), *aff'd* 773 F. App'x 627 (D.C. Cir. 2019), *cert. denied* 140 S. Ct. 381 (2019).

Poland's argument that *NextEra* is inapplicable because "Mercuria is not a private party to whom the arbitration agreement could have extended under well-settled EU law," Mem. at 23, simply ignores the Court of Appeals' clear ruling that, for purposes of establishing jurisdiction under 28 U.S.C. § 1605(a)(6), it is enough that the defendant is signatory to a treaty that is "for the benefit" of another signatory's investors. *NextEra*, 112 F.4th at 1102 ("But we need not and do not resolve whether Spain entered into separate arbitration agreements 'with' private parties because we conclude that it entered into an arbitration agreement—the Energy Charter Treaty itself—that is arguably 'for the[ir] benefit.'" (alteration in original)). Poland may disagree with the D.C. Circuit's ruling, but it does not (and cannot) demonstrate any difference between the material facts of that case and this one, and cannot contest the binding nature of *NextEra* here. *NextEra* resolves any question of this Court's subject matter jurisdiction in the affirmative.

### 2. This Court Has Subject Matter Jurisdiction Under 28 U.S.C. § 1605(a)(1)

Alternatively, this Court has jurisdiction under the "waiver exception." Under 28 U.S.C. § 1605(a)(1), a foreign state may "waive[] its immunity either explicitly or by implication." Foreign states implicitly waive sovereign immunity from enforcement of arbitral awards when

the state signs a treaty (such as the New York Convention) providing for enforcement of awards in U.S. courts. *See Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999) (approving Second Circuit's holding that "when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states") (quotation omitted). Courts in this District have applied *Creighton* to hold that New York Convention signatories waived immunity because "[they] should have anticipated enforcement actions in signatory states." *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 192 (D.D.C. 2018), *aff'd* 771 F. App'x 9 (D.C. Cir. 2019), *cert. denied Ukraine v. Tatneft*, 140 S. Ct. 901 (2020);[16] *see also Stati*, 199 F. Supp. 3d at 189 (applying *Creighton* and holding that Kazakhstan waived immunity to enforcement actions by signing the New York Convention); *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 663 F. Supp. 3d 11, 33–36 (D.D.C. 2023). Poland's waiver of immunity does not depend on whether it agreed to arbitrate intra-EU investment disputes. The waiver occurs "'when [the] country becomes a signatory to the Convention.'" *Creighton*, 181 F.3d at 123 (citation omitted). By signing the New York Convention and by agreeing to arbitrate within the territory of another Convention signatory (here, Sweden), Poland waived its immunity to jurisdiction in this recognition action. *See Amaplat Mauritius*, 663 F. Supp. 3d at 34–35; *Stati*, 199 F. Supp. 3d at 189.

### B.    POLAND FAILS TO MEET ITS BURDEN IN DEMONSTRATING THAT THE AWARD SHOULD NOT BE RECOGNIZED UNDER ARTICLE V OF THE NEW YORK CONVENTION

It being clear that jurisdiction is present, this Court should deny the Motion and recognize the Award. The United States has a strong and long-standing policy favoring the enforcement of

---

[16]    Although the D.C. Circuit in *Process and Industrial Developments Ltd. v. Federal Republic of Nigeria*, 27 F.4th 771, 775 n.3 (D.C. Cir. 2022) declined to apply the waiver exception in *Tatneft*, in light of "the ready applicability of the arbitration exception," this decision did not overrule *Tatneft*, nor did it consider the propriety of pleading a waiver exception in the alternative. The D.C. Circuit further declined to consider the issue in *NextEra*. 112 F.4th at 1100.

international arbitration agreements and awards. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 631 (1985) (explaining the "emphatic federal policy in favor of arbitral dispute resolution" will "appl[y] with special force in the field of international commerce"). Accordingly, Poland faces a "heavy burden" in opposing enforcement of the Award. *See, e.g.*, *Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 36 (D.D.C. 2016), *aff'd*, 852 F.3d 1107 (D.C. Cir. 2017) ("given the strong public policy in favor of international arbitration, a party challenging an award under the New York Convention bears a heavy burden."). It is well-established that this Court is required to recognize the Award unless Poland can establish that an Article V defense exists; if it succeeds in making that demonstration, the Court may, **but is not required**, to refuse recognition. As discussed below, two of the grounds raised by Poland—that the arbitration agreement was not valid and that the Award violates public policy—rest on mischaracterizations (or refusals to accept) governing caselaw, and plainly lack merit. The third—that the Award has been set aside by the Swedish courts—applies, but a careful examination of the facts and circumstances of this case demonstrates, with compelling force, why this Court should nonetheless exercise its discretion to enforce the Award.

### 1.    This Court's Discretion to Recognize the Award

The very first paragraph of Poland's brief asks this Court to accept a fundamental falsehood: that this case is "simple" because "there is no award" and "nothing to enforce." Mem. at 1. That is wrong. Both the New York Convention and federal decisional law make clear that this Court has ample discretion to recognize the Award despite its having been set aside. And Petitioners respectfully submit that when this Court reviews the tortured history around this issue—which has included an unexplained *volte-face* by EU Member States and the EC, strained legal arguments seemingly conceived under the pressure of mounting liabilities imposed by ECT arbitration tribunals, an unmistakable campaign of political pressure by the EC, and a judicial

decision—*Komstroy*—that announced a "rule" that did not apply to the parties litigating before it and appears unmistakably to serve as a tool to lend judicial support to Europe's political campaign around the ECT—Mercuria respectfully submits that this Court should conclude that the Award should be recognized.

To start, it is important to note that neither Article V of the New York Convention nor the Federal Arbitration Act ("**FAA**") **requires** this Court to refuse to recognize an award that is subject to an Article V defense. Article V lists the exclusive reasons upon which a court "**may**" refuse recognition or enforcement, and the use of the permissive word "may" was intended to recognize the enforcing court's discretion to nonetheless enforce an award even when one or more grounds for nonrecognition may apply. *Pemex*, 832 F.3d at 106 (noting that though tempered by comity concerns, "the plain text" used in Article V of the Panama and New York Conventions "seems to contemplate the unfettered discretion of a district court to enforce an arbitral award annulled in the awarding jurisdiction").

The use of the word "may" in the New York Convention was no accident: it represented a deliberate change from the predecessor Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 301 ("**Geneva Convention**"), pursuant to which a foreign court was **required** to refuse recognition of an award if it had been annulled in its country of origin, or if the respondent was deemed under some legal incapacity. Art. II, Geneva Convention (providing that "recognition and enforcement of the award **shall** be refused if" one of the grounds for non-recognition were met, including if "the award has been annulled in the country in which it was made."). This change was intended to facilitate the enforcement of awards, even in circumstances where the award has been deemed unenforceable under the laws of the arbitral seat.

The New York Convention further diminished the weight to be given by courts of other

Contracting States to the courts of the arbitral seat by eliminating the Geneva Convention's "double exequatur" requirement, which required an award creditor to first obtain recognition of the award by the courts of the arbitral seat and leave of those courts to pursue extraterritorial enforcement of the award.[17]  *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997) ("The primary defect of the Geneva Convention was that it required an award first to be recognized in the rendering state before it could be enforced abroad . . . the so-called requirement of 'double exequatur.'" (internal citations omitted)).  The law is clear that there is an Award and this Court has ample authority to recognize it.  It should do so, for the reasons that follow.

### 2.    The Court Should Recognize the Award

#### a)    The Court Should Not Defer to the Swedish Court's Vacatur of the Award

As discussed immediately above, while the New York Convention obligates Contracting States to enforce awards in the absence of an Article V defense, the converse is not true:  courts hearing matters under the New York Convention are never obligated to refuse recognition of a foreign award.  The D.C. Circuit has held that U.S. courts are not obliged to refuse recognition to an arbitral award as a matter of comity or deference to a foreign court's annulment of an award

---

[17]    To be clear, the New York Convention does not entirely discount the significance the arbitral seat, as evidenced by the references to it in Articles V(1)(e) and V(1)(a).  Because the arbitral seat is often chosen by agreement of the parties, the decisions of the courts of the arbitral seat are typically given significant weight.  Poland emphasizes this "choice" in its briefing and argues that Mercuria must be bound by its decision to arbitrate in Sweden.  Poland fails, however, to disclose that the arbitral seat in this case was established only as a result of Poland's steadfast refusal to arbitrate anywhere outside of the EU.  Kolkowski, ¶ 7.  As each of the other arbitration options provided under Article 26 of the ECT were either unavailable (Poland is not a signatory to the ICSID Convention) or would not be feasible absent Poland's agreement to an arbitral seat (as in the case of an *ad hoc* arbitration unaffiliated with any arbitral institution with the authority to set an arbitral seat), Poland's insistence on arbitrating within the EU effectively deprived Mercuria of any real "choice" in the matter.  *See id.* For a party in the position of Mercuria—whose claim arose out of its inability to obtain effective relief after spending (at that point) more than 11 years litigating in Polish courts, *see* Award ¶¶ 14, 176-81—arbitration was the only possible way to obtain relief.  And faced with the prospect of losing the ability to arbitrate altogether, Mercuria moved forward with the arbitration in Sweden.  But the arbitral seat in this case was not—as Poland contends—"chosen" by Mercuria; and it is disingenuous of Poland to state, as it does, that it played no role in the selection of the arbitral seat.  Kolkowski, ¶ 7.

where doing so would violate "fundamental notions of what is decent and just" under U.S. law. *TermoRio S.A., E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938-939 (D.C. Cir. 2007); *Getma Int'l v. Republic of Guinea*, 862 F.3d 45, 164 (D.C. Cir. 2017) (reaffirming *TermoRio*).

In *TermoRio*, the D.C. Circuit recognized "that there is a narrow public policy gloss on Article V(1)(e)." *TermoRio*, 487 F.3d at 938, 939. Following *TermoRio*, the Second Circuit found—in a case remarkably similar to this one—that U.S. public policy preventing the retroactive cancellation of contract rights justified the district court's exercise of "discretion, as allowed by treaty, to assess whether the nullification of the award offends basic standards of justice in the United States." *Pemex*, 832 F.3d at 107-10, 111. In *Pemex*, the Southern District of New York addressed whether an arbitration award issued against an arm of Mexico's state-owned oil company, Petróleos Exploración y Producción S.A. de C.V. ("**PEP**"), should be enforced notwithstanding that award being set aside in Mexico—the seat of arbitration. Notably, the Mexican court's decision to set aside the award centered on a change in law that purported to make arbitration unavailable to the claimant in that case. *Id.* at 97. As discussed below, the similarities between the Svea Court's decision to set aside Mercuria's award and the Mexican court's decision to set aside the award at issue in *Pemex* are strikingly similar. Courts that have been faced with awards annulled at the seat of arbitration after the award had already been recognized in the U.S. have likewise found that annulment at the seat need not preclude enforcement of an award in the United States. *Compañía De Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 451 (10th Cir. 2023) (district court did not abuse discretion in refusing to vacate judgment enforcing arbitral award under Rule 60(b)(5) when award was later annulled at seat).[18]

---

[18]    Though U.S. courts have seldom been asked to confirm awards which have been set aside, *see Grupo Cementos*,

Accordingly, this Court unquestionably has discretion to enforce the Award, even if it finds that a defense to enforcement under the New York Convention applies, as Poland concedes. Mem. at 26–27. The facts of this case compel the Court to exercise that discretion here.

To start, in determining whether to recognize the Award, Mercuria respectfully submits that the decision that should be examined—and the subject of any comity analysis—should be the CJEU's decision in *Komstroy*, since it is virtually indisputable that the Svea Court's decision was dictated by that decision. To the extent the Court finds that that the Svea Court exercised discretion and that its decision is the proper subject of inquiry, however, the same result should obtain: the Court need not, and should not, reach the same outcome and should recognize the Award. As discussed below, deference to the Set Aside Order—based as it is on *Komstroy* and on a complete turnabout by Poland and the relevant EU actors concerning the availability of intra-EU arbitration under a multilateral investment treaty—would result in the judicial expropriation of an arbitration award based on a retroactive application of law, and one that would leave Mercuria completely without a remedy. Viewed, as it must be, through that lens, the Svea Court's annulment of the Award, while perhaps vindicating **EU policy**, plainly violates bedrock principles of **U.S. public policy**, including the prohibition on retroactive application of laws and the imperative of affording aggrieved parties a forum in which to hear claims and obtain a remedy for legal wrongs. *See Pemex*, 832 F.3d at 108-110. Comity does not require this Court to follow the lead of the Svea Court in this case, as doing so would have the effect of retroactively depriving

---

58 F.4th at 446, the practice of other New York Convention States regarding the enforcement of awards annulled at the seat of arbitration further confirms that enforcing courts have the authority to enforce awards—even when set aside—and in certain circumstances should do so. For example, the French courts have long held that arbitral awards may be enforced regardless of whether they have been set aside by courts of the seat. *See, e.g.,* Collins Decl., Ex. F, *Cour de cassation,* 1re civ., Oct. 9, 1984. No. 83-11.355, Bull. civ. I, No. 248 (Fr.) (enforcing award annulled at seat). Similarly, English courts have recognized that awards annulled at the seat of arbitration may nevertheless be enforced in appropriate circumstances. Collins Decl., Ex. G, *Yukos Capital SARL v. OJSC Rosneft Oil Co.* [2014] EWHC 2188 (Comm) ¶¶ 20–22 (concluding that English court had discretion to enforce award notwithstanding annulment at seat where non-enforcement would offend English public policy).

Mercuria of an arbitral award and legitimizing a denial of justice and precluding Mercuria from obtaining any remedy, both of which would be "repugnant to fundamental notions of what is decent and just" in the United States. *TermoRio*, 487 F.3d at 938 (quoting *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981)).

> **b)**    **The Award Must be Recognized to Avoid an Inequitable Retroactive Application of Law**

The Supreme Court has held repeatedly that U.S. law strongly disfavors the retroactive application of law. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law."); *see also*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (explaining retroactively canceling existing contract rights is repugnant to U.S. public policy, which repugnance is "deeply rooted in [Supreme Court] jurisprudence, and embodies a legal doctrine centuries older than our Republic"). Canceling "existing contract rights is [likewise] repugnant to United States law." *Pemex*, 832 F.3d at 108 (quoting *Landgraf,* 511 U.S. at 265). "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* (quoting *Landgraf*, 511 U.S. at 265). It is similarly axiomatic that U.S. public policy strongly disfavors leaving claimants without any forum in which they can bring their claims. "The imperative of having cases heard—somewhere—is firmly embedded in legal doctrine." *Pemex*, 832 F.3d at 190. These arguments apply with force in this case.

Indeed, the facts of *Pemex* are strikingly similar to those here. In *Pemex*, the district court refused to defer to a Mexican court decision vacating an arbitral award that had the effect of retroactively nullifying an agreement to arbitrate between PEP and a foreign investor, COMMISA, based on a Mexican statute that did not exist at the time the investor commenced arbitration. *Corporación Mexicana de Mantenimiento Integral v. Pemex-Exploración y*

*Producción*, 962 F. Supp. 2d 642, 657-58 (S.D.N.Y. 2013) ("**Pemex SDNY Decision**").

The district court found that "[w]hen COMMISA initiated arbitration at the end of 2004, it had every reason to believe that its dispute with PEP could be arbitrated," and that "PEP had the authority to enter into such an arbitration provision." *Id*. The court further found that "PEP's own conduct showed that it considered itself subject to arbitration," noting that "PEP's initial arguments against arbitration had nothing to do with a 'public policy' against allowing state enterprises to enter arbitration, but instead were focused on narrow, technical grounds." *Id*. at 658. "It was not until . . . nearly three years after COMMISA initiated the arbitration, that PEP made the argument that public policy forbade arbitration," and it was five years after COMMISA commenced arbitration before "there was a source of law that supported the argument that the parties' dispute was not arbitrable." *Id*. at 658. While PEP argued that the Mexican Court decision did not expressly state that it was applying the new law retroactively, the district court found that, under the circumstances, it was clear that the Mexican Court relied primarily upon the new law in vitiating the arbitration agreement, and that such application was retroactive because the law did not exist at the time the arbitration agreement had been invoked. *Id*. at 658-59. The district court further noted that "this retroactive application of Section 98 was undertaken to favor a state enterprise over a private party." *Id*. at 659. Finally, the district court found that, because the statute of limitations for bringing a claim in the Mexican courts (as PEP suggested COMMISA should do) had expired, the "unfairness" of applying a law to retroactively vitiate the agreement to arbitrate "was exacerbated by the fact that the [Mexican] Court's decision left COMMISA without a remedy to litigate the merits of the dispute that the arbitrators had resolved. . . ." *Id*. Accordingly, the district court in *Pemex* found that the Mexican courts' nullification of the award "violated basic notions of justice" enshrined within U.S. law, *id*. at 644 and exercised its

discretion to recognize the award. The Second Circuit affirmed. *Pemex*, 832 F.3d at 112. It reasoned that "powerful considerations" of U.S. public policy, including "(1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum; and (4) the prohibition against government expropriation without compensation" justified the district court's confirmation of the award "notwithstanding invalidation of the award in the Mexican courts." *Id.* at 107.

This case is on all fours with *Pemex*, and the same result should obtain. Mercuria commenced the First ECT Arbitration in 2008, well before *Achmea*, and well before—in the words of Advocate General Wathelet—EU Member States "had the slightest suspicion that [intra-EU arbitration] might be incompatible" with EU law. Opinion of Advocate General Wathelet, Case C-284/16, ECLI:EU:C:2017:699, ¶ 43. Indeed, Poland raised no arguments concerning the purported "invalidity" of its consent to arbitrate when Mercuria first invoked ECT Article 26 to resolve its disputes over Mercuria's investment in JSE. Poland did not raise questions concerning the validity of its consent to arbitrate until the Second ECT Arbitration, which took place **more than eight years after the First ECT Arbitration**. Kołkowski, §§ I-II. Poland lacked any colorable basis for its intra-EU argument until *Komstroy*, which was issued **two years after** Mercuria commenced the Arbitration, and when the arbitration was nearly complete.

The retroactive application of law that Poland urges this Court to approve is even more egregious than in *Pemex* (where the retroactive act was a statute that clearly prohibited arbitration of the claim at issue) because the arguments Poland makes wither under even the slightest scrutiny. For example:

- Poland claims that it has always been understood that intra-EU arbitration was not

permitted under the ECT, Mem. at 13-14, but, as noted above, its own prior conduct and statements by the Advocate General, "whose task is to deliver an independent Opinion, analysing the relevant law and arguments of the parties and recommending a decision," Dashwood at 17, n. 37, show this not to have been the case.

- Poland claims that *Achmea* invalidated treaty-based intra-EU arbitration agreements, Mem. at 11-12, despite the fact that *Achmea* itself carved such agreements out from its ruling. *Achmea*, ¶ 57; Bjorklund ¶ 50. When the EU attempted to spin *Achmea*'s holding through the issuance of a political declaration, several EU Member States—including Sweden—rejected the proclamation, and stated affirmatively that *Achmea* did not apply to multilateral treaties such as the ECT. Bjorklund, ¶¶ 82–83.

- The *Komstroy* case in which the CJEU stated, in *dictum*, that the *Achmea* rule applied to the ECT did not involve any EU Member States or EU-based investors as parties, Dashwood, ¶¶ 53-54, leaving one to wonder why the CJEU made a statement in a decision that did not apply to either of the parties before it.

- At the time the CJEU ruled in *Komstroy*, European states were facing—and losing—a multitude of ECT arbitration claims raising the prospect of billions of dollars' worth of damages. Collins Decl., Ex. A, Energy Charter Treaty, Statistics, (Dec. 1, 2023).

- The overwhelming majority of arbitral tribunals confronted with the objection to intra-EU arbitration argument—and all of the tribunals to have considered it before *Komstroy* was issued—have rejected it. Bjorklund ¶ 145. These tribunals are generally comprised of experienced lawyers trained in international law. *Id*.

Finally, by the time the Svea Court annulled the Award in this case, the EC had raised the prospect of imposing sanctions on Sweden as a result of its supposedly lackadaisical approach to

killing off intra-EU investment arbitrations.  Collins Decl., Ex. E, EU Commission Infringement Decisions, Dec. 2, 2021, at 13–14.  Stated simply, the CJEU's ruling in *Komstroy,* when viewed in the surrounding political circumstances, strongly suggests willful favoritism on the part of the EU's institutions in favor of their own Member States (and their treasuries) over private parties, in violation of the "basic principle of justice [that] where a sovereign has waived its immunity and has agreed to contract with a private party, a court hearing a dispute regarding that contract should treat the private party and the sovereign as equals."[19]  *See Pemex SDNY Decision*, 962 F. Supp. 2d at 659 (citing *United States v. Winstar Corp*., 518 U.S. 839, 895 (1996) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." (citation omitted)).

> ### c)   The Award Must Be Recognized or Mercuria Will Be Left Without a Remedy

Additionally, as in *Pemex*, refusing recognition of the Award on the basis that ECT Article 26 was rendered ineffective by *Komstroy* would also leave Mercuria without any remedy. The Polish courts and the MRA have not provided, and will not provide, Mercuria with effective means to obtain relief, as was underscored by the Tribunal's well-supported findings; indeed, the Polish courts' insufficiency is what led to the Arbitration in the first place.  Award, ¶ 816.  Poland does not seriously contest that Mercuria would be left without any remedy, instead simply arguing that this result should not bother this Court because Mercuria allegedly "had ample knowledge that beginning an intra-EU arbitration involved significant risk."  Mem. at 27.

Poland's failure to contest that Mercuria lacks a remedy is unsurprising.  Under Polish law, parties alleging to have been harmed by the issuance of an administrative decision are not

---

[19]   On this point, Mercuria respectfully suggests that a private party who filed a complaint embodying a similar array of interpretations and constructions of a contract would have a difficult time getting past a motion to dismiss; but for the *Komstroy* decision, Poland's arguments would have virtually no credibility whatsoever under the interpretive rules that govern both contract and treaty disputes in U.S. courts.

entitled to damages unless the administrative body that issued the subject decision has itself determined the illegality of its prior decision. *Id.* ¶ 16. The likelihood of obtaining such a finding from the MRA would have been (and remains) virtually nil. The MRA repeatedly refused to comply with the Polish court judgments concluding that JSE was entitled to be paid back the Second Penalty and that ordered the MRA to resolve JSE's application. Award, ¶ 238 (discussing the SAC's third decision). And the MRA has continued to issue rulings adverse to the instructions of the Polish courts and the Minister of Energy. Kołkowski, § III. So, the suggestion that the Polish courts and MRA will provide Mercuria and/or JSE with an "adequate remedy" in this circumstance has no credibility, particularly in light of the Tribunal's well-supported findings that Poland and its courts have repeatedly failed to provide Mercuria effective means to resolve this dispute. Award, ¶ 816.

Poland's does not dispute this.[20] Rather, Poland argues that this Court must defer to the Svea Court's decision merely because Mercuria had the opportunity to participate in the proceedings that led to that decision. Mem. at 28. Whether the Svea Court afforded Mercuria due process or not, this Court is not compelled to—and, in fact, should not—give effect to the Set Aside Order where, as here, it would violate the strong U.S. public policy against leaving meritorious claims without a forum in which to resolve them. *Pemex*, 832 F.3d at 106 ("[A] final judgment obtained through sound procedures in a foreign country is generally conclusive *unless*

---

[20] In connection with its argument that this case should be dismissed on grounds of *forum non conveniens*, Poland blithely suggests that Mercuria could bring a claim before "European courts" or the European Court of Human Rights ("**ECtHR**"), Mem. at 37. Given that the basis of Mercuria's injury was Poland's refusal to comply with the judgments of its own courts granting relief to Mercuria, resort to national courts in Europe has already proven an inadequate remedy. Poland has also failed to articulate any specific legal basis upon which Mercuria could bring a claim before the ECtHR, and Mercuria submits that there is none. Should Poland wish to elaborate on what this legal basis would be in its reply briefing, Mercuria will provide a specific response at that time. However, Mercuria notes initially that **there are currently around 700 pending cases against Poland concerning problems with its judiciary**, and that Poland is currently in noncompliance with an outstanding ECtHR judgment against it. *See* Collins Decl., Ex. H (Poland, Press Country Profile, European Court of Human Rights). There is no reason to believe that Poland will decide to comply with an ECtHR judgment vindicating Mercuria's claim any more than it has complied with the rulings of its own courts.

enforcement of the judgment would offend the public policy of the state in which enforcement is sought." (quoting *Ackermann v. Levine*, 788 F.2d 830, 837 (2d Cir. 1986) (internal quotations and alterations omitted, emphasis in original)).  Had the Svea Court failed to afford Mercuria due process, that would be an **additional, independent** basis for this Court to refuse to defer to it, but the regularity of the Svea Court proceedings does not itself require this Court to defer to them, particularly where, as noted above, the Svea Court proceedings were the mere culmination of what was a clear and intentional effort on the part of the EU, its institutions, and its Member States to walk away from that well-established and universally-accepted dispute resolution method that, largely as a result of policy decisions made by the Member States, had begun to result in significant liabilities.

In sum, the record clearly demonstrates that deferring to the Svea Court's decision would countenance a retroactive application of law that would leave Mercuria without a remedy or a forum for redress.  That result would be "repugnant to fundamental notions of what is decent and just in the United States." *TermoRio,* 487 F.3d at 939; *Pemex*, 832 F.3d at 107.  Accordingly, this Court should enforce the Award notwithstanding the Svea Court's decision—which may have been entirely proper as a matter of EU law, but which is fundamentally incompatible with international law and strong U.S. public policy interests.

### 3.    Poland Agreed to Arbitrate Under Applicable Law (Article V(1)(a))

As explained above, this Court should in its discretion enforce the Award notwithstanding any of Poland's Article V arguments, because declining to do so would violate the strong U.S. public policy against retroactive applications of law that deprive parties of contractual rights and any forum in which to bring their claims.  This applies equally to Poland's Article V(1)(a) objection, which is simply a repackaging of the same claim for the retroactive application of EU law that underlies the Set Aside Order and its other arguments, and likewise rests on a retroactive

application of *Komstroy*, which did not exist at the time of Mercuria's investment and when it commenced arbitration. The objection fails for several reasons, set forth below.

a)    **The Arbitrators' Finding that Poland Agreed to Arbitrate is Conclusive**

Poland attempts to cast its intra-EU objection as a claim that it "never concluded" an agreement to arbitrate under Article V(1)(a) of the New York Convention. Mem. at 38; *see also id* at 28-29. But as the D.C. Circuit held in *NextEra*, the intra-EU objection raised by EU Member States like Spain (in *NextEra*) and Poland (in this case) concern the "**scope**" of the arbitration agreement, "not its **existence**." *NextEra*, 112 F.4th at 1103 (emphasis in original). Specifically, the D.C. Circuit noted that "Spain's view . . . that the standing offer to arbitrate contained in Article 26 of the ECT does not extend to EU nationals like the companies," was "an argument regarding the **scope** of the Energy Charter Treaty, not its **existence**" because "[i]t goes to whether the ECT's arbitration provision applies to these disputes." *Id*.

As such, Poland's objection is more appropriately analyzed under Article V(1)(c) of the New York Convention, which addresses situations where the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration."

Viewed—as the D.C. Circuit has expressly held it must—as a scope issue, Poland's objection must be resolved with substantial deference to the Tribunal's jurisdictional rulings. It is black-letter law that where parties agree to arbitrate under rules that empower the arbitrators to decide their own jurisdiction, the arbitrators' resulting jurisdictional findings are not subject to *de novo* review at the award recognition stage. *See, e.g. Stileks*, 985 F.3d at 878 ("That standard is more than mere deference . . . If an agreement assigns the arbitrability determinations to an arbitrator '**a court possesses no power to decide the arbitrability issue**.'") (quoting *Henry*

*Schein Inc. v. Archer & White Sales, Inc.,* 586 U.S. 63, 68 (2019) (emphasis added)); *Chevron* 795 F.3d at 207–208 (rejecting Article V(1)(c) defense because "there [is] no need for the District Court to independently determine" jurisdiction under treaty since "the parties had delegated this task to the arbitrator").

Poland has never contested that the arbitral tribunal was clearly and unmistakably empowered to decide on its own jurisdiction. *See* Award, ¶ 252 ("[T]he Tribunal's power to determine its own jurisdiction . . . is undisputed between the Parties and reflected in Section 2 of the Swedish Arbitration Act that reads: 'The arbitrators may rule on their own jurisdiction to decide the dispute.'"); *see supra* n.6; *see also* Ragnwaldh ¶ 10. It also does not contest that the arbitrators found that a valid arbitration agreement existed between Mercuria and Poland. This Court is not at liberty to review that determination, and insofar as Poland has requested the Court to refuse to recognize the Award under Article V(a)(1) because the parties did not agree to arbitrate this dispute, that request lacks merit and must be denied.

> **b)** **Assuming, *Arguendo*, that the Court Concludes It Must Determine Whether Poland Agreed to Arbitrate with Mercuria, It Must Conclude that Article 26 of the ECT Constitutes a Standing, Binding Offer to Arbitrate**

Poland alleges that the Award should be refused recognition under Article V(1)(a) of the New York Convention because (1) there was no valid agreement to arbitrate under EU law, and (2) Poland lacked the capacity to consent to arbitrate with Mercuria under EU law. Each of these objections is meritless.

> **(1)** **Poland Agreed to Arbitrate as a Matter of International Law**

The first branch of Poland's Article V(1)(a) objection fails on its face because the agreement to arbitrate was unquestionably valid under **international law**—the "law to which the parties subjected" their agreement. Poland does not dispute this. *See* Mem. at 29 (equating

"applicable rules and principles of international law" with the "law to which the parties have subjected" the agreement).[21]

Applying international law, as this Court must, it is clear there was no infirmity in the arbitration agreement or Poland's ability to offer to arbitrate with Mercuria. Customary international law rules govern the resolution of conflicts between treaties—such as the EU treaties and the ECT. Bjorklund, ¶ 59. The Vienna Convention on the Law of Treaties ("**VCLT**") is regarded as customary international law for treaty interpretation, and embodies near-universal principles of contract interpretation, including the obligation to interpret treaties in good faith, in accordance with the terms' ordinary meaning, and in light of the treaty's object and purpose. *Id.*, ¶¶ 59-60. As the D.C. Circuit itself remarked in *NextEra*, the plain language of the ECT clearly permits investors from one Contracting Party to bring claims against other Contracting Parties. *Id.* ¶ 61; *see also NextEra* 112 F.4th at 1102 (noting that "[t]he [ECT] offers powerful reasons to conclude that the standing offer to arbitrate contained in the ECT's arbitration provision extends to EU nationals," and pointing out that "[t]he clear terms of the ECT's arbitration provision cover '[d]isputes between a Contracting Party and an Investor of another Contracting Party.'"). ¶ 61. And, because Poland ratified the ECT, "Poland cannot escape its obligations under international law by invoking EU law or *Komstroy*." *Id.* ¶¶ 139, 143.

Even if there were ever any doubt, the ECT expressly provides that Article 26 takes precedence and must be followed in the event of a conflict between the ECT's dispute resolution provisions and the EU treaties. **First**, the "unconditional" nature of each Contracting Party's Article 26 obligations is bolstered by the presence of ECT Article 16, which provides that Contracting Parties may not derogate from their ECT obligations in deference to another treaty

---

[21]   The "law of the country where the award was made"—here, Swedish law—does not become part of the analysis under Article V(1)(a) unless the parties have "fail[ed]" to "indicat[e]" the law applicable to their agreement.

where the rights provided under the ECT are "more favourable to the investor or investment." ECT, art. 16. Poland's argument deprives EU-based investors of "more favourable" treatment by denying them access to ECT arbitration. *See* Bjorklund, ¶¶ 8, 92, n.73; Kołkowski, § IV; *see also* Award ¶ 429. Article 16 applies regardless of whether the ECT was signed first or later. ECT, art. 16(2). This fact, without more, fatally undermines Poland's argument that no arbitration agreement existed, particularly where the EU itself is a signatory to the ECT.

**Second**, as found by the D.C. Circuit in *NextEra*, the lack of a "disconnection clause"—a treaty concept used to carve certain subject matters or parties out of a treaty's application—in the ECT further undermines Poland's arguments. *NextEra*, 112 F.4th at 1102 ("[I]f the ECT's drafters nonetheless intended to exempt intra-EU disputes, they could have done so through a 'disconnection clause'. . . ."). The EU has included disconnection clauses in other treaties, Dashwood, ¶ 39, n.34, and the ECT itself contains a disconnection clause pursuant to which a different provision of the ECT, Article 16, does not apply vis-à-vis the previously ratified Svalbard Treaty. Bjorklund, ¶ 62. The failure to include a disconnection clause carving out intra-EU disputes (or any other language preserving the CJEU's ability to rule on questions of EU law)[22] significantly undermines Poland's position. *Id*.; *see also* Bjorklund, Ex. 23, *RREEF Infrastructure (G.P.) Ltd. et al. v. Kingdom of Poland*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, June 6, 2016, ¶¶ 84-85.

**Third**, the EU's ratification of the ECT is further evidence of the EU and its Member States' acceptance of their obligation to arbitrate disputes under the ECT—including intra-EU disputes. Under settled principles of treaty interpretation, the EU's ratification of the ECT— including its dispute resolution mechanism—must be understood as an agreement by the EU to

---

[22] The negotiating history of the treaty also reveals that the EU proposed to add a disconnection clause with respect to the EU treaties, but that clause **was not included** in the final treaty. Bjorklund, ¶ 64; Dashwood, ¶ 40.

permit any claims under the treaty to be resolved conclusively through arbitration, despite that its own law might not permit that result.   Bjorklund ¶¶ 59-64; *accord Zuver v. Sprigg*, 2018 WL 3617308, at *7 (D.D.C. June 13, 2018) ("one who assents to a writing is presumed to know its contents") (citation omitted).

**Finally**, Poland's argument that "[t]he law of the seat of the arbitration governs the validity of the arbitration agreement," Mem. at 29 (citing *Balkan Energy Ltd. v. Repub. Of Ghana*, 302 F. Supp. 3d 144 (D.D.C. 2018), makes no sense in the context of a multilateral treaty like the ECT since "[t]he ECT was meant to ensure security of investments and uniformity of treatment of investors, regardless of their country of origin, in all of the Contracting Parties." Bjorklund, ¶ 76.   It would be "perverse" if the validity of the ECT's protections—including the "unconditional consent" to arbitrate provided by Article 26(3)—were subject to different interpretations depending on whether the investor happened to invoke one of the arbitration options under Article 26(4) that contemplates an arbitral seat[23] (much less on the location of that seat, which may be a mere fortuity).   Bjorklund, ¶ 128.[24]

### (2)    Poland's EU Law Arguments Do Not Establish an "Incapacity" to Arbitrate Under EU Law

Unable to rebut the overwhelming evidence of the parties' agreement to arbitrate under the law applicable to the Parties' agreement—international law—Poland instead argues that the CJEU's decisions in *Achmea*, *Komstroy*, and *PL Holdings* rendered Poland's offer to arbitrate intra-EU disputes under the ECT void *ab initio*.  Mem. at 23-25.

The manifest injustice of Poland's argument is unmistakable.  At bottom, Poland asserts

---

[23]    ICSID arbitration does not contemplate a "seat" of arbitration.  *See, e.g.*, Restatement (Third) of the U.S. Law of International Commercial and Investment Arbitration § 5.1 cmt. e (2023).

[24]    To the extent Poland suggests that *Blasket* supports its position, Mem. at 29, Poland has drastically misread the case and mislead the court.  *Blasket Renewable v. Spain*, 665 F. Supp. 3d 1 (D.D.C. 2023).  That case concerned only whether an agreement to arbitrate existed for purposes of **subject matter jurisdiction under the FSIA.** 665 F. Supp. 3d at 12–13.  The D.C. Circuit **reversed** that holding in *NextEra*, 112 F.4th at 1102–03.

that it violated its obligations under EU law by signing the ECT and giving its unconditional consent to arbitrate under Article 26 of the ECT with intra-EU investors. Poland now wishes to bring itself back in compliance with EU law by disavowing—after the fact—its obligations under the ECT. While, as discussed above, the proper way to cure such a violation of EU law would be to withdraw from the ECT, thus not prejudicing investors who relied upon the treaty's protections, Poland asserts instead that it must be retroactively released from the obligations flowing from its accession to the ECT, and that the awards of investors who relied on Poland's signature on the ECT when they commenced arbitration should simply be nullified. Poland's proposed course of action seeks to shift responsibility for its own mistake to Mercuria. But even EU law does not condone this result, and this Court should not do so either.

**First**, where an EU Member State's international commitment conflicts with EU law, EU law does not operate to automatically invalidate the incompatible international obligation. *See* Dashwood, ¶ 20. Rather, that incompatibility gives rise to an obligation on the part of the relevant EU Member State to cure that incompatibility by amending the offending national law or withdrawing from the offending international obligation. *See id.* ¶ 21. Given Poland's undisputed signature to the ECT, the only means available for its withdrawal lies in Article 47 of the ECT, which requires Poland to adhere to all of its obligations under the ECT until the expiration of the sunset period under the treaty.

**Second**, the principle of good faith under EU law precludes any resolution of an incompatibility between EU Law and the ECT in a way that favors the Member State responsible for violating EU law over an investor who relied on the ECT in good faith. Dashwood, ¶ 127. Under EU law, where the parties acted in good faith and there is a serious risk of economic harm if the CJEU's interpretation of EU law is applied, a temporal limitation may be applied so that its

41

interpretation only applies prospectively.  Dashwood, § VI(A)(3).  A party who acted in good faith and faces a serious risk of economic harm from a retroactive application of law is precisely "the situation of Mercuria and other investors that accepted standing offers of arbitration made by EU Member States."  *Id.* ¶ 129.

### 4.    The Award Does Not Violate U.S. Public Policy (Article V(2)(b))

Poland argues that enforcement of the Award is against U.S. public policy "because it would violate the foreign sovereign compulsion doctrine and offend principles of comity."  Mem. at 30.  Neither argument has any basis.  Rather, **refusal to recognize the Award** would undermine the bedrock U.S. policy against the retroactive application of law that leaves a claim without any forum to be heard or redressed, as explained above.

### a)    The Foreign Sovereign Compulsion Doctrine Does Not Apply

Poland's argument that enforcement of the Award would violate the foreign sovereign compulsion doctrine is meritless.  Indeed, Poland's novel reading of the foreign sovereign compulsion doctrine must be rejected for at least two reasons.  **First**, the doctrine, if it is available at all, applies to **private parties**, not governments, and it does not apply in the context of international arbitral award enforcement.  *See Nextera Energy Glob. Holdings B.V.*, 656 F. Supp. 3d 201, 219 (D.D.C. 2023) ("The D.C. Circuit has not adopted [the foreign sovereign compulsion] doctrine.  Importantly, this is not an antitrust case, and therefore the doctrine is inapplicable. . ."); *Micula v. Gov't of Rom.*, No. 15 Misc. 107, 2015 WL 4643180, at *8 (S.D.N.Y. Aug. 5, 2015) ("[a]ssuming . . .a sovereign like Romania could invoke the defense . . . it would nonetheless be unavailing" due to "Romania's voluntary submission to the ICSID process through its treaty with Sweden") (*rev'd on other grounds*, 714 F. App'x 18 (2d Cir. 2017) (summary order)).

**Second**, even if it were applicable, the doctrine is invoked to justify non-compliance with a U.S. order or statute if the "person in question appears likely to suffer severe sanctions for

failing to comply with foreign law." Restatement (Fourth) of Foreign Relations Law § 442 (2018). Poland has not attempted to show it would suffer "severe sanctions" if the Award is recognized. At best, Poland identified a conflict between EU and international law. But there is "no general doctrine of international law that requires a state to excuse compliance with its law because of conflict with the law of another state." *Id.*

### b)      Enforcement of the Award Poses No Comity Concerns

Poland's argument that "enforcing the award would violate principles of comity that the United States should accord to Poland and the EU's constitutional order and judicial system," Mem. at 32, is similarly meritless. As the D.C. Circuit confirmed in *BCB Holdings,* Article V(2)(b) "was not meant to enshrine the vagaries of international politics under the rubric of 'public policy.'" 110 F. Supp. 3d 233, 250 (D.D.C. 2015) (quoting *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir. 1974)). The public policy in question must be "well defined and dominant" and not derived "from general considerations of supposed public interests." *Id.* (citations omitted). "To read the public policy defense as a parochial device protective of national political interests would seriously undermine the Convention's utility." *Parsons*, 508 F.2d at 974. Poland's argument goes to the heart of *BCB Holdings*' and *Parsons*' admonitions. It would allow the EU and its Member States to ignore their international law obligations under the ECT under the guise of protecting their own national interests, and to ask for the United States' stamp of approval for doing so. Mercuria respectfully submits that that is not "comity." But, as the D.C. Circuit held in *Chevron* in response to an argument by Ecuador that enforcement of an award would "flout Ecuador's sovereignty" by requiring it to take steps which it considered in conflict with its internal laws, *Chevron Corp. v. Repub. of Ecuador*, 949 F. Supp. 2d 57, 70 (D.D.C. 2013), "the Court has found that there was a valid agreement to arbitrate between the parties . . . the Court

cannot now say that enforcing it through the precise means contemplated by the treaty would contravene the strong public policy of the United States." *Id.* So too here.

### C.    POLAND'S *FORUM NON CONVENIENS* ARGUMENT MUST BE REJECTED

Poland also asks this Court to dismiss Mercuria's Petition on *forum non conveniens* grounds. Mem. at 35. Poland's request is categorically barred by controlling law in this Circuit. As the D.C. Circuit squarely held in *NextEra*, "**forum non conveniens is not available in proceedings to confirm a foreign arbitral award**." 112 F.4th at 1105 (quoting *Stileks*, 985 F.3d at 876 n.1); *see also TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 303-04 (D.C. Cir. 2005) (holding *forum non conveniens* is not available in proceedings to confirm a foreign arbitral award because only U.S. courts can attach foreign commercial assets found within the United States).

### D.    POLAND'S REQUEST FOR ATTORNEY'S FEES BORDERS ON THE FRIVOLOUS

Finally, Poland asks this Court to award Poland attorney's fees and costs on the basis that Mercuria is "in clear violation of the Svea [C]ourt's ruling." Mem. at 39. This request is absurd. Poland cites no basis for such an award of attorneys' fees in U.S. law, and if Mercuria were in clear violation of the Svea Court's order (and it is not), the Svea Court would be perfectly capable of enforcing its own rulings, with its own contempt powers, and without aid from this Court.

Poland cites no authority—and Mercuria is aware of none—for the proposition that a U.S. court may impose fee-shifting orders on parties on the basis of alleged violations of orders issued by foreign countries' courts. Poland relies on *King v. Allied Vision*, 65 F.3d 1051, 1058 (2d Cir. 1995), which concerned a finding of civil contempt by the U.S. District Court for the Southern District of New York on the basis of the violation of a consent decree issued by **that court**, and which **suggested the lower court should reconsider its grant of attorneys' fees** in light of the decision. *Id.* at 1063. That case offers no support for Poland's highly unusual request for

attorney's fees here.  Poland's only other authority, *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 386 (1980) is equally unavailing.  That case concerned whether the Freedom of Information Act required a federal agency to release documents whose disclosure had been enjoined by a district court.  It had nothing to do with fee-shifting on the basis of contempt (much less on the basis of an alleged violation of an order of a foreign court, which court has not actually made any finding of contempt).

In any event, Mercuria did not violate any order of the Svea Court because the Inhibition Order had no extraterritorial effect and precluded enforcement only within Sweden.  Ragnwaldh, ¶ 18.  It did not preclude any other actions to enforce the award in foreign jurisdictions pursuant to the New York Convention,[25] and Poland has not offered any evidence to establish that the Inhibition order had extraterritorial effect.  Nor has Poland, at any point during the past 15 months that this action has been pending before this Court, ever asked the Svea Court to hold Mercuria in contempt of the Inhibition Order, likely because such an application would have been rejected. *Id*. ¶¶ 9, 11.  Accordingly, there has been no violation of the Svea Court's order, much less a finding of contempt by the Svea Court (or any other court) that could justify a civil contempt sanction of any sort, much less a sanction of the requested fee-shifting.  Poland's request for fees and costs is therefore manifestly meritless and must be rejected out of hand.

## IV.    CONCLUSION

For the foregoing reasons, Mercuria respectfully requests that the Court deny Poland's Motion, grant Mercuria's Petition, and enter judgment accordingly.  ECF 1 at 14.

---

[25]    As explained in Section III.B. above, it is well understood that the New York Convention allows, and was promulgated with the aim of permitting, award creditors to immediately seek enforcement in signatory nations other than the country where the award was made so as to eliminate the "double exequatur" requirement under the Geneva Convention (which prohibited the cross-border enforcement of an arbitral award until the courts of the arbitral seat had given leave to the award creditor to enforce the award extraterritorially). *See, e.g., Toys "R" Us*, 126 F.3d at 22.

Dated:  New York, New York
         March 10, 2025

Respectfully submitted,

 _/s/ James E. Berger_____
James E. Berger (D.C. Bar No. 481408)
Charlene C. Sun (D. C. Bar No. 1027854)
Erin Collins (D.C. Bar No. 1781667)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 335-4500
Fax: (212) 35-4001
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com
erin.collins@us.dlapiper.com

John C. Canoni (*pro hac vice*)
Tel: (214) 743-4500
Fax: (214) 743-4545
1900 N. Pearl St, Suite 2200
Dallas, Texas
john.canoni@us.dlapiper.com

*Attorneys for Petitioner*